# AKE *v.* OKLAHOMA

No. 83–5424.   Argued November 7, 1984—Decided February 26, 1985

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed an opinion concurring in the judgment, *post*, p. 87. REHNQUIST, J., filed a dissenting opinion, *post*, p. 87.

*Arthur B. Spitzer* argued the cause for petitioner. With him on the briefs were *Elizabeth Symonds, Charles S. Sims, Burt Neuborne,* and *William B. Rogers.*

*Michael C. Turpen,* Attorney General of Oklahoma, argued the cause for respondent. With him on the brief was *David W. Lee,* Assistant Attorney General.*

JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is whether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question.

I

Late in 1979, Glen Burton Ake was arrested and charged with murdering a couple and wounding their two children. He was arraigned in the District Court for Canadian County,

---

*Briefs of *amici curiae* urging reversal were filed for the New Jersey Department of the Public Advocate by *Joseph H. Rodriguez* and *Michael L. Perlin;* for the American Psychiatric Association by *Joel I. Klein;* and for the American Psychological Association et al. by *Margaret Farrell Ewing, Donald N. Bersoff,* and *Bruce J. Ennis.* Briefs of *amici curiae* also supporting petitioner were filed for the Public Defender of Oklahoma et al. by *Robert A. Ravitz, Frank McCarthy,* and *Thomas J. Ray, Jr.;* and for the National Legal Aid and Defender Association et al. by *Richard J. Wilson* and *James M. Doyle.*

Okla., in February 1980. His behavior at arraignment, and in other prearraignment incidents at the jail, was so bizarre that the trial judge, *sua sponte*, ordered him to be examined by a psychiatrist "for the purpose of advising with the Court as to his impressions of whether the Defendant may need an extended period of mental observation." App. 2. The examining psychiatrist reported: "At times [Ake] appears to be frankly delusional . . . . He claims to be the 'sword of vengeance' of the Lord and that he will sit at the left hand of God in heaven." *Id.*, at 8. He diagnosed Ake as a probable paranoid schizophrenic and recommended a prolonged psychiatric evaluation to determine whether Ake was competent to stand trial.

In March, Ake was committed to a state hospital to be examined with respect to his "present sanity," *i. e.*, his competency to stand trial. On April 10, less than six months after the incidents for which Ake was indicted, the chief forensic psychiatrist at the state hospital informed the court that Ake was not competent to stand trial. The court then held a competency hearing, at which a psychiatrist testified:

> "[Ake] is a psychotic . . . his psychiatric diagnosis was that of paranoid schizophrenia—chronic, with exacerbation, that is with current upset, and that in addition . . . he is dangerous. . . . [B]ecause of the severity of his mental illness and because of the intensities of his rage, his poor control, his delusions, he requires a maximum security facility within—I believe—the State Psychiatric Hospital system." *Id.*, at 11–12.

The court found Ake to be a "mentally ill person in need of care and treatment" and incompetent to stand trial, and ordered him committed to the state mental hospital.

Six weeks later, the chief forensic psychiatrist informed the court that Ake had become competent to stand trial. At the time, Ake was receiving 200 milligrams of Thorazine, an antipsychotic drug, three times daily, and the psychiatrist indicated that, if Ake continued to receive that dosage, his

condition would remain stable. The State then resumed proceedings against Ake.

At a pretrial conference in June, Ake's attorney informed the court that his client would raise an insanity defense. To enable him to prepare and present such a defense adequately, the attorney stated, a psychiatrist would have to examine Ake with respect to his mental condition at the time of the offense. During Ake's 3-month stay at the state hospital, no inquiry had been made into his sanity at the time of the offense, and, as an indigent, Ake could not afford to pay for a psychiatrist. Counsel asked the court either to arrange to have a psychiatrist perform the examination, or to provide funds to allow the defense to arrange one. The trial judge rejected counsel's argument that the Federal Constitution requires that an indigent defendant receive the assistance of a psychiatrist when that assistance is necessary to the defense, and he denied the motion for a psychiatric evaluation at state expense on the basis of this Court's decision in *United States ex rel. Smith* v. *Baldi,* 344 U. S. 561 (1953)...

Ake was tried for two counts of murder in the first degree, a crime punishable by death in Oklahoma, and for two counts of shooting with intent to kill. At the guilt phase of trial, his sole defense was insanity. Although defense counsel called to the stand and questioned each of the psychiatrists who had examined Ake at the state hospital, none testified about his mental state at the time of the offense because none had examined him on that point. The prosecution, in turn, asked each of these psychiatrists whether he had performed or seen the results of any examination diagnosing Ake's mental state at the time of the offense, and each doctor replied that he had not. *As a result, there was no expert testimony for either side on Ake's sanity at the time of the offense.* The jurors were then instructed that Ake could be found not guilty by reason of insanity if he did not have the ability to distinguish right from wrong at the time of the alleged offense. They

were further told that Ake was to be presumed sane at the time of the crime unless *he* presented evidence sufficient to raise a reasonable doubt about his sanity at that time. If he raised such a doubt in their minds, the jurors were informed, the burden of proof shifted to the State to prove sanity beyond a reasonable doubt.[1] The jury rejected Ake's insanity defense and returned a verdict of guilty on all counts.

At the sentencing proceeding, the State asked for the death penalty. No new evidence was presented. The prosecutor relied significantly on the testimony of the state psychiatrists who had examined Ake, and who had testified at the guilt phase that Ake was dangerous to society, to establish the likelihood of his future dangerous behavior. Ake had no expert witness to rebut this testimony or to introduce on his behalf evidence in mitigation of his punishment. The jury sentenced Ake to death on each of the two murder counts, and to 500 years' imprisonment on each of the two counts of shooting with intent to kill.

On appeal to the Oklahoma Court of Criminal Appeals, Ake argued that, as an indigent defendant, he should have been provided the services of a court-appointed psychiatrist. The court rejected this argument, observing: "We have held numerous times that, the unique nature of capital cases notwithstanding, the State does not have the responsibility of

---

[1] Oklahoma Stat., Tit. 21, § 152 (1981), provides that "[a]ll persons are capable of committing crimes, except those belonging to the following classes . . . (4) Lunatics, insane persons and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness." The Oklahoma Court of Criminal Appeals has held that there is an initial presumption of sanity in every case, "which remains until the defendant raises, by sufficient evidence, a reasonable doubt as to his sanity at the time of the crime. If the issue is so raised, the burden of proving the defendant's sanity beyond a reasonable doubt falls upon the State." 663 P. 2d 1, 10 (1983) (case below); see also *Rogers* v. *State*, 634 P. 2d 743 (Okla. Crim. App. 1981).

providing such services to indigents charged with capital crimes." 663 P. 2d 1, 6 (1983). Finding no error in Ake's other claims,[2] the court affirmed the convictions and sentences. We granted certiorari. 465 U. S. 1099 (1984).

We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one. Accordingly, we reverse.

## II

Initially, we must address our jurisdiction to review this case. After ruling on the merits of Ake's claim, the Oklahoma court observed that in his motion for a new trial Ake had not repeated his request for a psychiatrist and that the claim was thereby waived. 663 P. 2d, at 6. The court cited *Hawkins* v. *State*, 569 P. 2d 490 (Okla. Crim. App. 1977), for this proposition. The State argued in its brief to this Court that the court's holding on this issue therefore rested on an adequate and independent state ground and ought not be reviewed. Despite the court's state-law ruling, we conclude that the state court's judgment does not rest on an independent state ground and that our jurisdiction is therefore properly exercised.

The Oklahoma waiver rule does not apply to fundamental trial error. See *Hawkins* v. *State, supra*, at 493; *Gaddis*

---

[2] The Oklahoma Court of Criminal Appeals also dismissed Ake's claim that the Thorazine he was given during trial rendered him unable to understand the proceedings against him or to assist counsel with his defense. The court acknowledged that Ake "stared vacantly ahead throughout the trial" but rejected Ake's challenge in reliance on a state psychiatrist's word that Ake was competent to stand trial while under the influence of the drug. 663 P. 2d, at 7–8, and n. 5. Ake petitioned for a writ of certiorari on this issue as well. In light of our disposition of the other issues presented, we need not address this claim.

v. *State*, 447 P. 2d 42, 45–46 (Okla. Crim. App. 1968). Under Oklahoma law, and as the State conceded at oral argument, federal constitutional errors are "fundamental." Tr. of Oral Arg. 51–52; see *Buchanan* v. *State*, 523 P. 2d 1134, 1137 (Okla. Crim. App. 1974) (violation of constitutional right constitutes fundamental error); see also *Williams* v. *State*, 658 P. 2d 499 (Okla. Crim. App. 1983). Thus, the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed. Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question.

As we have indicated in the past, when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded. See *Herb* v. *Pitcairn*, 324 U. S. 117, 126 (1945) ("We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of Federal laws, our review could amount to nothing more than an advisory opinion"); *Enterprise Irrigation District* v. *Farmers Mutual Canal Co.*, 243 U. S. 157, 164 (1917) ("But where the non-Federal ground is so interwoven with the other as not to be an independent matter, or is not of sufficient breadth to sustain the judgment without any decision of the other, our jurisdiction is plain"). In such a case, the federal-law holding is integral to the state court's disposition of the matter, and our ruling on the issue is in no respect advisory. In this case, the additional holding of the state court—that the constitutional challenge presented here was waived—depends on the court's federal-law ruling and consequently does not present an independent state ground for the decision rendered. We therefore turn to a consideration of the merits of Ake's claim.

## III

This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. In recognition of this right, this Court held almost 30 years ago that once a State offers to criminal defendants the opportunity to appeal their cases, it must provide a trial transcript to an indigent defendant if the transcript is necessary to a decision on the merits of the appeal. *Griffin* v. *Illinois*, 351 U. S. 12 (1956). Since then, this Court has held that an indigent defendant may not be required to pay a fee before filing a notice of appeal of his conviction, *Burns* v. *Ohio*, 360 U. S. 252 (1959), that an indigent defendant is entitled to the assistance of counsel at trial, *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), and on his first direct appeal as of right, *Douglas* v. *California*, 372 U. S. 353 (1963), and that such assistance must be effective. See *Evitts* v. *Lucey*, 469 U. S. 387 (1985); *Strickland* v. *Washington*, 466 U. S. 668 (1984); *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14 (1970).[3]  Indeed, in *Little* v. *Streater*, 452 U. S. 1 (1981), we extended this principle of meaningful participation to a "quasi-criminal" proceeding and held that, in a paternity action, the State cannot deny the putative father blood grouping tests, if he cannot otherwise afford them.

---

[3] This Court has recently discussed the role that due process has played in such cases, and the separate but related inquiries that due process and equal protection must trigger. See *Evitts* v. *Lucey; Bearden* v. *Georgia*, 461 U. S. 660 (1983).

Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, see *Ross* v. *Moffitt*, 417 U. S. 600 (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," *id.*, at 612. To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," *Britt* v. *North Carolina*, 404 U. S. 226, 227 (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them.

To say that these basic tools must be provided is, of course, merely to begin our inquiry. In this case we must decide whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense. Three factors are relevant to this determination. The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. See *Little* v. *Streater*, *supra*, at 6; *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976). We turn, then, to apply this standard to the issue before us.

A

The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. Indeed, the host of safeguards fashioned by this Court over the years to diminish the risk of erroneous conviction stands as a testament to that concern. The interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious and weighs heavily in our analysis.

We consider, next, the interest of the State. Oklahoma asserts that to provide Ake with psychiatric assistance on the record before us would result in a staggering burden to the State. Brief for Respondent 46–47. We are unpersuaded by this assertion. Many States, as well as the Federal Government, currently make psychiatric assistance available to indigent defendants, and they have not found the financial burden so great as to preclude this assistance.[4] This is

---

[4] See Ala. Code § 15–12–21 (Supp. 1984); Alaska Stat. Ann. § 18.85.100 (1981); Ariz. Rev. Stat. Ann. § 13–4013 (1978) (capital cases; extended to noncapital cases in *State* v. *Peeler*, 126 Ariz. 254, 614 P. 2d 335 (App. 1980)); Ark. Stat. Ann. § 17–456 (Supp. 1983); Cal. Penal Code Ann. § 987.9 (West Supp. 1984) (capital cases; right recognized in all cases in *People* v. *Worthy*, 109 Cal. App. 3d 514, 167 Cal. Rptr. 402 (1980)); Colo. Rev. Stat. § 18–1–403 (Supp. 1984); *State* v. *Clemons*, 168 Conn. 395, 363 A. 2d 33 (1975); Del. Code Ann., Tit. 29, § 4603 (1983); Fla. Rule Crim. Proc. 3.216; Haw. Rev. Stat. § 802–7 (Supp. 1983); *State* v. *Olin*, 103 Idaho 391, 648 P. 2d 203 (1982); *People* v. *Watson*, 36 Ill. 2d 228, 221 N. E. 2d 645 (1966); *Owen* v. *State*, 272 Ind. 122, 396 N. E. 2d 376 (1979) (trial judge may authorize or appoint experts where necessary); Iowa Rule Crim. Proc. 19; Kan. Stat. Ann. § 22–4508 (Supp. 1983); Ky. Rev. Stat. §§ 31.070, 31.110, 31.185 (1980); *State* v. *Madison*, 345 So. 2d 485 (La. 1977); *State* v. *Anaya*, 456 A. 2d 1255 (Me. 1983); Mass. Gen. Laws Ann., ch. 261, § 27C(4) (West Supp. 1984–1985); Mich. Comp. Laws Ann. § 768.20a(3) (Supp. 1983); Minn. Stat. § 611.21 (1982); Miss. Code Ann. § 99–15–17 (Supp. 1983); Mo. Rev. Stat. § 552.030.4 (Supp. 1984); Mont. Code Ann. § 46–8–201 (1983); *State* v. *Suggett*, 200 Neb. 693, 264 N. W. 2d 876 (1978) (discretion to appoint psychiatrist rests with trial court); Nev. Rev. Stat. § 7.135 (1983); N. H. Rev. Stat. Ann. § 604–A:6 (Supp. 1983); N. M. Stat. Ann. §§ 31–16–2, 31–16–8 (1984); N. Y. County Law § 722–c (McKinney Supp.

especially so when the obligation of the State is limited to provision of one competent psychiatrist, as it is in many States, and as we limit the right we recognize today. At the same time, it is difficult to identify any interest of the State, other than that in its economy, that weighs against recognition of this right. The State's interest in prevailing at trial—unlike that of a private litigant—is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases. Thus, also unlike a private litigant, a State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained. We therefore conclude that the governmental interest in denying Ake the assistance of a psychiatrist is not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions.

Last, we inquire into the probable value of the psychiatric assistance sought, and the risk of error in the proceeding if such assistance is not offered. We begin by considering the pivotal role that psychiatry has come to play in criminal proceedings. More than 40 States, as well as the Federal Government, have decided either through legislation or judicial decision that indigent defendants are entitled, under certain circumstances, to the assistance of a psychiatrist's expertise.[5] For example, in subsection (e) of the Criminal Justice Act, 18 U. S. C. § 3006A, Congress has provided that indi-

---

1984–1985); N. C. Gen. Stat. § 7A–454 (1981); Ohio Rev. Code Ann. § 2941.51 (Supp. 1983); Ore. Rev. Stat. § 135.055(4) (1983); *Commonwealth* v. *Gelormo,* 327 Pa. Super. 219, 227, and n. 5, 475 A. 2d 765, 769, and n. 5 (1984); R. I. Gen. Laws § 9–17–19 (Supp. 1984); S. C. Code § 17–3–80 (Supp. 1983); S. D. Codified Laws § 23A–40–8 (Supp. 1984); Tenn. Code Ann. § 40–14–207 (Supp. 1984); Tex. Code Crim. Proc. Ann., Art. § 26.05 (Vernon Supp. 1984); Utah Code Ann. § 77–32–1 (1982); Wash. Rev. Code §§ 10.77.020, 10.77.060 (1983) (see also *State* v. *Cunningham,* 18 Wash. App. 517, 569 P. 2d 1211 (1977)); W. Va. Code § 29–21–14(e)(3) (Supp. 1984); Wyo. Stat. §§ 7–1–108; 7–1–110; 7–1–116 (1977).

[5] See n. 4, *supra.*

gent defendants shall receive the assistance of all experts "necessary for an adequate defense." Numerous state statutes guarantee reimbursement for expert services under a like standard. And in many States that have not assured access to psychiatrists through the legislative process, state courts have interpreted the State or Federal Constitution to require that psychiatric assistance be provided to indigent defendants when necessary for an adequate defense, or when insanity is at issue. [6]

These statutes and court decisions reflect a reality that we recognize today, namely, that when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee* v. *Balkcom*, 339 U. S. 9, 12 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists

---

[6] *Ibid.*

ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party. When jurors make this determination about issues that inevitably are complex and foreign, the testimony of psychiatrists can be crucial and "a virtual necessity if an insanity plea is to have any chance of success."[7] By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them. It is for this reason that States rely on psychiatrists as examiners, consultants, and witnesses, and that private individuals do as well,

---

[7] Gardner, The Myth of the Impartial Psychiatric Expert—Some Comments Concerning Criminal Responsibility and the Decline of the Age of Therapy, 2 Law & Psychology Rev. 99, 113–114 (1976). In addition, "[t]estimony emanating from the depth and scope of specialized knowledge is very impressive to a jury. The same testimony from another source can have less effect." F. Bailey & H. Rothblatt, Investigation and Preparation of Criminal Cases § 175 (1970); see also ABA Standards for Criminal Justice 5–1.4, Commentary, p. 5·20 (2d ed. 1980) ("The quality of representation at trial . . . may be excellent and yet valueless to the defendant if the defense requires the assistance of a psychiatrist . . . and no such services are available").

when they can afford to do so.[8]   In so saying, we neither approve nor disapprove the widespread reliance on psychiatrists but instead recognize the unfairness of a contrary holding in light of the evolving practice.

The foregoing leads inexorably to the conclusion that, without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high.   With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination.

A defendant's mental condition is not necessarily at issue in every criminal proceeding, however, and it is unlikely that psychiatric assistance of the kind we have described would be of probable value in cases where it is not.   The risk of error from denial of such assistance, as well as its probable value, is most predictably at its height when the defendant's mental condition is seriously in question.   When the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in

---

[8] See also *Reilly* v. *Barry*, 250 N. Y. 456, 461, 166 N. E. 165, 167 (1929) (Cardozo, C. J.) ("[U]pon the trial of certain issues, such as insanity or forgery, experts are often necessary both for prosecution and for defense. . . . [A] defendant may be at an unfair disadvantage, if he is unable because of poverty to' parry by his own witnesses the thrusts of those against him"); 2 I. Goldstein & F. Lane, Goldstein Trial Techniques § 14.01 (2d ed. 1969) ("Modern civilization, with its complexities of business, science, and the professions, has made expert and opinion evidence a necessity.   This is true where the subject matters involved are beyond the general knowledge of the average juror"); Henning, The Psychiatrist in the Legal Process, in By Reason of Insanity: Essays on Psychiatry and the Law 217, 219–220 (L. Freedman ed., 1983) (discussing the growing role of psychiatric witnesses as a result of changing definitions of legal insanity and increased judicial and legislative acceptance of the practice).

his defense, the need for the assistance of a psychiatrist is readily apparent. It is in such cases that a defense may be devastated by the absence of a psychiatric examination and testimony; with such assistance, the defendant might have a reasonable chance of success. In such a circumstance, where the potential accuracy of the jury's determination is so dramatically enhanced, and where the interests of the individual and the State in an accurate proceeding are substantial, the State's interest in its fisc must yield.[9]

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

## B

Ake also was denied the means of presenting evidence to rebut the State's evidence of his future dangerousness. The foregoing discussion compels a similar conclusion in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness. We have repeatedly recognized the defendant's compelling interest in fair adjudication at the sentencing phase of a capital case. The State, too, has a profound inter-

---

[9] In any event, before this Court the State concedes that such a right exists but argues only that it is not implicated here. Brief for Respondent 45; Tr. of Oral Arg. 52. It therefore recognizes that the financial burden is not always so great as to outweigh the individual interest.

est in assuring that its ultimate sanction is not erroneously imposed, and we do not see why monetary considerations should be more persuasive in this context than at trial. The variable on which we must focus is, therefore, the probable value that the assistance of a psychiatrist will have in this area, and the risk attendant on its absence.

This Court has upheld the practice in many States of placing before the jury psychiatric testimony on the question of future dangerousness, see *Barefoot* v. *Estelle*, 463 U. S. 880, 896–905 (1983), at least where the defendant has had access to an expert of his own, *id.*, at 899, n. 5. In so holding, the Court relied, in part, on the assumption that the factfinder would have before it both the views of the prosecutor's psychiatrists and the "opposing views of the defendant's doctors" and would therefore be competent to "uncover, recognize, and take due account of . . . shortcomings" in predictions on this point. *Id.*, at 899. Without a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor. In such a circumstance, where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase.

## C

The trial court in this case believed that our decision in *United States ex rel. Smith* v. *Baldi*, 344 U. S. 561 (1953), absolved it completely of the obligation to provide access to a psychiatrist. For two reasons, we disagree. First, neither *Smith*, nor *McGarty* v. *O'Brien*, 188 F. 2d 151, 155 (CA1 1951), to which the majority cited in *Smith*, even suggested that the Constitution does not require any psychiatric examination or assistance whatsoever. Quite to the contrary, the

record in *Smith* demonstrated that neutral psychiatrists in fact had examined the defendant as to his sanity and had testified on that subject at trial, and it was on that basis that the Court found no additional assistance was necessary. *Smith, supra,* at 568; see also *United States ex rel. Smith* v. *Baldi,* 192 F. 2d 540, 547 (CA3 1951). Similarly, in *McGarty,* the defendant had been examined by two psychiatrists who were not beholden to the prosecution. We therefore reject the State's contention that *Smith* supports the broad proposition that "[t]here is presently no constitutional right to have a psychiatric examination of a defendant's sanity at the time of the offense." Brief in Opposition 8. At most it supports the proposition that there is no constitutional right to more psychiatric assistance than the defendant in *Smith* had received.

In any event, our disagreement with the State's reliance on *Smith* is more fundamental. That case was decided at a time when indigent defendants in state courts had no constitutional right to even the presence of counsel. Our recognition since then of elemental constitutional rights, each of which has enhanced the ability of an indigent defendant to attain a fair hearing, has signaled our increased commitment to assuring meaningful access to the judicial process. Also, neither trial practice nor legislative treatment of the role of insanity in the criminal process sits paralyzed simply because this Court has once addressed them, and we would surely be remiss to ignore the extraordinarily enhanced role of psychiatry in criminal law today.[10] Shifts in all these areas since the time of *Smith* convince us that the opinion in that case was addressed to altogether different variables, and that we are not limited by it in considering whether fundamental fairness today requires a different result.

---

[10] See Henning, *supra* n. 8; Gardner, *supra* n. 7, at 99; H. Huckabee, Lawyers, Psychiatrists and Criminal Law: Cooperation or Chaos? 179–181 (1980) (discussing reasons for the shift toward reliance on psychiatrists); Huckabee, Resolving the Problem of Dominance of Psychiatrists in Criminal Responsibility Decisions: A Proposal, 27 Sw. L. J. 790 (1973).

## IV

We turn now to apply these standards to the facts of this case. On the record before us, it is clear that Ake's mental state at the time of the offense was a substantial factor in his defense, and that the trial court was on notice of that fact when the request for a court-appointed psychiatrist was made. For one, Ake's sole defense was that of insanity. Second, Ake's behavior at arraignment, just four months after the offense, was so bizarre as to prompt the trial judge, *sua sponte*, to have him examined for competency. Third, a state psychiatrist shortly thereafter found Ake to be incompetent to stand trial, and suggested that he be committed. Fourth, when he was found to be competent six weeks later, it was only on the condition that he be sedated with large doses of Thorazine three times a day, during trial. Fifth, the psychiatrists who examined Ake for competency described to the trial court the severity of Ake's mental illness less than six months after the offense in question, and suggested that this mental illness might have begun many years earlier. App. 35. Finally, Oklahoma recognizes a defense of insanity, under which the initial burden of producing evidence falls on the defendant.[11] Taken together, these factors make clear that the question of Ake's sanity was likely to be a significant factor in his defense.[12]

In addition, Ake's future dangerousness was a significant factor at the sentencing phase. The state psychiatrist who treated Ake at the state mental hospital testified at the guilt phase that, because of his mental illness, Ake posed a threat of continuing criminal violence. This testimony raised the issue of Ake's future dangerousness, which is an aggravating factor under Oklahoma's capital sentencing scheme, Okla. Stat., Tit. 21, § 701.12(7) (1981), and on which the prosecutor relied at sentencing. We therefore conclude that Ake also

---

[11] See n. 1, *supra*.

[12] We express no opinion as to whether any of these factors, alone or in combination, is necessary to make this finding.

was entitled to the assistance of a psychiatrist on this issue and that the denial of that assistance deprived him of due process.[13]

Accordingly, we reverse and remand for a new trial.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring in the judgment.

This is a capital case in which the Court is asked to decide whether a State may refuse an indigent defendant "any opportunity whatsoever" to obtain psychiatric evidence for the preparation and presentation of a claim of insanity by way of defense when the defendant's legal sanity at the time of the offense was "seriously in issue."

The facts of the case and the question presented confine the actual holding of the Court. In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases. Nothing in the Court's opinion reaches noncapital cases.

JUSTICE REHNQUIST, dissenting.

The Court holds that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Ante,* at 74. I do not think that the facts of this case warrant the establishment of such a principle; and I think that even if the factual predicate of the Court's statement were established, the constitutional rule announced by the Court is far too broad. I would limit the rule to capital cases, and make clear that the entitlement is to an independent psychiatric evaluation, not to a defense consultant.

---

[13] Because we conclude that the Due Process Clause guaranteed to Ake the assistance he requested and was denied, we have no occasion to consider the applicability of the Equal Protection Clause, or the Sixth Amendment, in this context.

Petitioner Ake and his codefendant Hatch quit their jobs on an oil field rig in October 1979, borrowed a car, and went looking for a location to burglarize. They drove to the rural home of Reverend and Mrs. Richard Douglass, and gained entrance to the home by a ruse. Holding Reverend and Mrs. Douglass and their children, Brooks and Leslie, at gunpoint, they ransacked the home; they then bound and gagged the mother, father, and son, and forced them to lie on the living room floor. Ake and Hatch then took turns attempting to rape 12-year-old Leslie Douglass in a nearby bedroom. Having failed in these efforts, they forced her to lie on the living room floor with the other members of her family.

Ake then shot Reverend Douglass and Leslie each twice, and Mrs. Douglass and Brooks once, with a .357 magnum pistol, and fled. Mrs. Douglass died almost immediately as a result of the gunshot wound; Reverend Douglass' death was caused by a combination of the gunshots he received, and strangulation from the manner in which he was bound. Leslie and Brooks managed to untie themselves and to drive to the home of a nearby doctor. Ake and his accomplice were apprehended in Colorado following a month-long crime spree that took them through Arkansas, Louisiana, Texas, and other States in the western half of the United States.

Ake was extradited from Colorado to Oklahoma on November 20, 1979, and placed in the city jail in El Reno, Oklahoma. Three days after his arrest, he asked to speak to the Sheriff. Ake gave the Sheriff a detailed statement concerning the above crimes, which was first taped, then reduced to 44 written pages, corrected, and signed by Ake.

Ake was arraigned on November 23, 1979, and again appeared in court with his codefendant Hatch on December 11th. Hatch's attorney requested and obtained an order transferring Hatch to the state mental hospital for a 60-day observation period to determine his competency to stand trial; although Ake was present in court with his attorney

during this proceeding, no such request was made on behalf of Ake.

On January 21, 1980, both Ake and Hatch were bound over for trial at the conclusion of a preliminary hearing. No suggestion of insanity at the time of the commission of the offense was made at this time. On February 14, 1980, Ake appeared for formal arraignment, and at this time became disruptive. The court ordered that Ake be examined by Dr. William Allen, a psychiatrist in private practice, in order to determine his competency to stand trial. On April 10, 1980, a competency hearing was held at the conclusion of which the trial court found that Ake was a mentally ill person in need of care and treatment, and he was transferred to a state institution. Six weeks later, the chief psychiatrist for the institution advised the court that Ake was now competent to stand trial, and the murder trial began on June 23, 1980. At this time Ake's attorney withdrew a pending motion for jury trial on present sanity. Outside the presence of the jury the State produced testimony of a cellmate of Ake, who testified that Ake had told him that he was going to try to "play crazy."

The State at trial produced evidence as to guilt, and the only evidence offered by Ake was the testimony of the doctors who had observed and treated him during his confinement pursuant to the previous order of the court. Each of these doctors testified as to Ake's mental condition at the time of his confinement in the institution, but none could express a view as to his mental condition at the time of the offense. Significantly, although all three testified that Ake suffered from some form of mental illness six months after he committed the murders, on cross-examination two of the psychiatrists specifically stated that they had "no opinion" concerning Ake's capacity to tell right from wrong at the time of the offense, and the third would only speculate that a psychosis might have been "apparent" at that time. The Court

makes a point of the fact that "there was no expert testimony for either side on Ake's sanity at the time of the offense." *Ante,* at 72 (emphasis deleted). In addition, Ake called no lay witnesses, although some apparently existed who could have testified concerning Ake's actions that might have had a bearing on his sanity at the time of the offense; and although two "friends" of Ake's who had been with him at times proximate to the murders testified at trial at the behest of the prosecution, defense counsel did not question them concerning any of Ake's actions that might have a bearing on his sanity.

The Court's opinion states that before an indigent defendant is entitled to a state-appointed psychiatrist the defendant must make "a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." *Ante,* at 74. But nowhere in the opinion does the Court elucidate how that requirement is satisfied in this particular case. Under Oklahoma law, the burden is initially on the defendant to raise a reasonable doubt as to his sanity at the time of the offense. Once that burden is satisfied, the burden shifts to the State to prove sanity beyond a reasonable doubt. *Ake* v. *State,* 663 P. 2d 1, 10 (1983). Since the State introduced *no* evidence concerning Ake's sanity at the time of the offense, it seems clear that as a matter of state law Ake failed to carry the initial burden. Indeed, that was the holding of the Oklahoma Court of Criminal Appeals. *Ibid.*

Nor is this a surprising conclusion on the facts here. The evidence of the brutal murders perpetrated on the victims, and of the month-long crime spree following the murders, would not seem to raise any question of sanity unless one were to adopt the dubious doctrine that no one in his right mind would commit a murder. The defendant's 44-page confession, given more than a month after the crimes, does not suggest insanity; nor does the failure of Ake's attorney to move for a competency hearing at the time the codefendant

moved for one. The first instance in this record is the disruptive behavior at the time of formal arraignment, to which the trial judge alertly and immediately responded by committing Ake for examination. The trial commenced some two months later, at which time Ake's attorney withdrew a pending motion for jury trial on present sanity, and the State offered the testimony of a cellmate of Ake who said that the latter had told him that he was going to try to "play crazy." The Court apparently would infer from the fact that Ake was diagnosed as mentally ill some six months after the offense that there was a reasonable doubt as to his ability to know right from wrong when he committed it. But even the experts were unwilling to draw this inference.

Before holding that the State is obligated to furnish the services of a psychiatric witness to an indigent defendant who reasonably contests his sanity at the time of the offense, I would require a considerably greater showing than this. And even then I do not think due process is violated merely because an indigent lacks sufficient funds to pursue a state-law defense as thoroughly as he would like. There may well be capital trials in which the State assumes the burden of proving sanity at the guilt phase, or "future dangerousness" at the sentencing phase, and makes significant use of psychiatric testimony in carrying its burden, where "fundamental fairness" would require that an indigent defendant have access to a court-appointed psychiatrist to evaluate him independently and—if the evaluation so warrants—contradict such testimony. But this is not such a case. It is highly doubtful that due process requires a State to make available an insanity defense to a criminal defendant, but in any event if such a defense is afforded the burden of proving insanity can be placed on the defendant. See *Patterson* v. *New York*, 432 U. S. 197 (1977). That is essentially what happened here, and Ake failed to carry his burden under state law. I do not believe the Due Process Clause superimposes a federal

standard for determining how and when sanity can legitimately be placed in issue, and I would find no violation of due process under the circumstances.

With respect to the necessity of expert psychiatric testimony on the issue of "future dangerousness," as opposed to sanity at the time of the offense, there is even less support for the Court's holding. Initially I would note that, given the Court's holding that Ake is entitled to a new trial with respect to guilt, there was no need to reach issues raised by the sentencing proceedings, so the discussion of this issue may be treated as dicta. But in any event, the psychiatric testimony concerning future dangerousness was obtained from the psychiatrists when they were called as *defense* witnesses, not prosecution witnesses. Since the State did not initiate this line of testimony, I see no reason why it should be required to produce still more psychiatric witnesses for the benefit of the defendant.

Finally, even if I were to agree with the Court that some right to a state-appointed psychiatrist should be recognized here, I would not grant the broad right to "access to a competent psychiatrist who will conduct an appropriate examination *and assist in evaluation, preparation, and presentation of the defense." Ante,* at 83 (emphasis added). A psychiatrist is not an attorney, whose job it is to advocate. His opinion is sought on a question that the State of Oklahoma treats as a question of *fact.* Since any "unfairness" in these cases would arise from the fact that the only competent witnesses on the question are being hired by the State, all the defendant should be entitled to is one competent opinion—whatever the witness' conclusion—from a psychiatrist who acts independently of the prosecutor's office. Although the independent psychiatrist should be available to answer defense counsel's questions prior to trial, and to testify if called, I see no reason why the defendant should be entitled to an opposing view, or to a "defense" advocate.

For the foregoing reasons, I would affirm the judgment of the Court of Criminal Appeals of Oklahoma.