Alfredo Trejo MUÑOZ *v.* STATE of Arkansas

CR 99-432                                        9 S.W.3d 497

Supreme Court of Arkansas
Opinion delivered January 27, 2000

*Longino & Morton*, by: *George B. Morton* and *James H. Longino*; R. *Charles Wilkins III*, Rule XV, for appellant.

*Mark Pryor*, Att'y Gen., by: *Sandy Moll*, Ass't Att'y Gen., for appellee.

Том Glaze, Justice. Appellant Alfredo Trejo Muñoz brings this appeal from a conviction of the rape of the three-year-old baby of Muñoz's girlfriend, Michelle Araujo. We accepted the appeal from the court of appeals because the case involves the question of first impression as to whether an indigent criminal defendant has a right, under *Ake v. Oklahoma*, 470 U.S. 68 (1985), to have the State pay for an independent expert DNA analysis. Upon review of the case, we are unable to reach the merits of the question as certified because it was not properly preserved at trial.

On July 23, 1998, Muñoz followed Michelle home from work in case her car ran out of gas.[1] On the way home, Michelle picked up her baby at day care, went home, and temporarily left her baby with Muñoz at Michelle's house while Michelle went to put gas in her car. When Michelle returned about ten or fifteen minutes later, the baby was upset and was having difficulty sitting on the couch.

---

[1] Much of what we relate that occurred on July 23 and the following day has not been abstracted, and since we affirm this appeal, we have gone to the transcript so the reader will have sufficient information to understand what led to the filing of felony charges against Muñoz.

Muñoz told Michelle that he had spanked the baby because she would not stop crying. Michelle noticed a stain on Muñoz's jeans, which Muñoz said was chocolate syrup. Later that evening after Muñoz left, the baby went to her mother crying and said that her "butt was bleeding." She told Michelle that "Fredo spanked me." Michelle examined the baby's bottom and saw blood in her panties. Michelle asked her baby what Muñoz had spanked her with, and the baby replied, "He spanked me with his weewee." Michelle then gathered the baby's clothing and took the child to the Washington Regional Medical Center. However, before Michelle had left her house, Muñoz called her and instructed her to stay home, and if she was not there when he returned, "you know what will happen." Michelle proceeded to the Center's emergency room where a nurse assisted in performing a rape kit on the child. A doctor examined the baby and found peri-rectal lacerations consistent with penetration and which were suspicious for sexual abuse. While Michelle and her child were in the emergency room, Muñoz was seen in his vehicle outside the Medical Center circling the parking lot. He was arrested and found to have a .22 rifle and lead pipe in his possession.

On the following day, July 24, Muñoz was formally charged with rape. On July 27, he was arraigned, appointed counsel, and the prosecutor filed a motion for Muñoz to give blood, saliva, semen, and hair samples. Muñoz was taken immediately to the Medical Center, where the samples were obtained.

On November 6, 1998, Muñoz obtained private counsel, who later, on December 8, moved to exclude all hair and bodily fluid samples taken on the day of arraignment. He contended that the samples had been taken before the court's July 27 order had been entered, and Muñoz's counsel had not been afforded the opportunity to be present when the samples were taken. Muñoz's new attorney also moved to exclude from the State's evidence the .22 rifle and lead pipe found in his possession when he was arrested. Finally, Muñoz's counsel moved that, in order to prepare his defense, he needed a DNA expert to interpret the fluid tests, to give an independent analysis, and to testify at trial.

On December 14, two days before trial, the trial court heard Muñoz's motions, and denied his three requests. The trial court refused to exclude the State's fluid tests because Muñoz's counsel had agreed to the taking of Muñoz's hair and fluid samples on July

27, the arraignment date. It further denied excluding the .22 rifle and lead pipe because those items were relevant to show consciousness of guilt. The trial court also denied the appointment of a DNA expert, finding his request was untimely. He further ruled that even if his motion had been timely, the court did not believe *Ake* required a DNA expert.

On December 15, 1998, Muñoz moved for a continuance and retesting of forensic evidence, basing his motion on a new blood test that had been conducted by his expert, Captain Charles Rexford of the Washington County Sheriff's Department. Rexford ran a test on Muñoz's jeans worn on July 24, 1998, and said three of his tests showed negative for the presence of blood and one test showed marginally positive for blood. The trial court denied the continuance request because Rexford had tested a different piece of the jeans than the State's experts had tested, and because the blood tests had nothing to do with the DNA analysis, which had been conducted from the semen taken from the baby's panties, her rectal swab, and Muñoz's fluid samples.

The Muñoz case proceeded to trial on December 16, when the State presented six witnesses and Muñoz offered only one witness, Captain Rexford. The jury returned its verdict of guilty, and then the sentencing phase was conducted. During that phase, Muñoz sought reassurance that his motion to exclude the weapons found in his possession, when he was arrested, had been ruled on. The trial court denied Muñoz's motion, and the State introduced testimony of the .22 rifle and lead pipe during the sentencing phase. On appeal, Muñoz only argues two points — the trial court erred (1) in refusing him the assistance of a DNA expert and (2) in allowing the weapons' evidence during the sentencing phase.

In addressing Muñoz's first point for reversal, we must first consider the trial court's ruling that Muñoz was too late in raising the question of whether he was entitled to the appointment of a DNA expert. Muñoz was well aware that the State had taken fluid samples from him in July 1998, and the prosecutor indicated those lab results were obtained in August of 1998. And while Muñoz complains that the prosecutor never objected to Muñoz's failure to make a timely request for a DNA expert, the prosecutor very plainly stated Muñoz's motion was tantamount to requesting a continuance, which the trial court should not grant. The trial court

ruled it did not think Muñoz's motion was timely, and it denied his motion.

In *Swanson v. State*, 308 Ark. 28, 823 S.W.2d 812 (1992), we held that the denial of a continuance which would deprive an accused of the chance to have an independent review of DNA analysis will be closely examined. *See also Hunter v. State*, 316 Ark. 746, 875 S.W.2d 63 (1994). In making such an examination in the present case, we cannot conclude the trial court abused its discretion in denying any continuance so a DNA expert could be appointed. As already noted above, the State's results from its test samples taken from Muñoz were available in August of 1998, or approximately four months prior to the trial date of December 16, 1998. Nevertheless, Muñoz waited until about one week before trial to request a DNA expert and did not obtain a ruling until two days before trial. Like the appellant in the *Swanson* case, Muñoz had months to locate an expert witness and make a tentative arrangement for an independent review, yet Muñoz could not offer the name of a potential expert witness, nor did he offer any hope of procuring the attendance of such a witness in the near future. *Id.* at 35; *but see Hunter*, 316 Ark. at 751, 875 S.W.2d at 66 (where this court distinguished *Swanson*, reversing the trial court for failing to grant Hunter a continuance when (1) Hunter's DNA expert had no chance to examine the State's evidence, procedures, and protocol, and (2) Hunter had located an expert, but could not take advantage of her expertise without being provided the State's information). In the circumstances before us, Muñoz's motion was tantamount to a continuance request, and we cannot say the trial court abused its discretion denying his requests.

We next turn to Muñoz's second argument wherein he claims the trial court erred in refusing to exclude evidence of the .22 rifle and lead pipe during the sentencing phase of his trial. Muñoz submits that these weapons were "other crimes" evidence that was more prejudicial than probative. However, Muñoz abstracts very little of the testimony presented at either the guilt or sentencing phase. Nonetheless, as we set out above, the record reflects that Muñoz told Michelle on the evening the offense took place that she "had better be home when he got there or else," and related to that threat, he was found that evening, with the weapons in his car, circling the hospital. The trial court concluded that such actions by

Muñoz were relevant since they indicated a consciousness of guilt. We hold the trial court did not abuse its discretion.

For the reasons above, we affirm.