Ed Harrell, Jr. appeals from the denial of his coram nobis petition after the appointment of counsel and the conducting of a full evidentiary hearing thereon by the trial court.
On October 1, 1981, Ed Harrell, Jr. shot and killed Bessemer Police Officer Tommy Lee Thedford. He was indicted for the capital offense involving the murder of a police officer defined in Alabama Code 1975, § 13A-5-40(a)(5). The jury found Harrell "guilty of the capital offense as charged in the indictment" and, later, recommended by a vote of eleven to one that "the penalty be life without parole". The trial judge refused to accept the jury's recommendation and sentenced Harrell to death by electrocution.
On original direct appeal thirteen issues were presented to this court which affirmed this cause as Harrell v. State,470 So.2d 1303 (Ala.Cr.App. 1984).
The appellant then made application for writ of certiorari to the Supreme Court of Alabama where this cause was reviewed in full and some six additional issues were also reviewed. The cause was there affirmed in an opinion reported as Ex ParteHarrell, 470 So.2d 1309 (Ala. 1985). The appellant then made application for writ of certiorari to the Supreme Court of the United States which denied this writ in an order reported asHarrell v. Alabama, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276
(1985).
In addition to the matters which are set forth in the petition for writ of error coram nobis, the appellant sought to have reviewed and examined at the hearing certain records which were in the possession of the Director of the Taylor Hardin Mental Health Facility in Alabama. In addition, the trial court also ordered that the records of Bryce Hospital, with reference to this appellant, be made available to this appellant and his counsel. Thereafter, a full hearing was conducted on the coram nobis petition as required by law. The trial court then entered specific findings with reference to each of the allegations made in this petition.
Because of the thorough and complete order and judgment of the trial court entered in this cause, this court adopts same as Appendix A to this opinion. The same is attached hereto and made a part hereof.
This court, as required by Rule 45A, A.R.A.P., has carefully reviewed the record in this cause. We have considered each allegation as set forth in the coram nobis petition and those which were heretofore asserted in this court and the Supreme Court of Alabama.
 I
We adhere completely to the views heretofore expressed in the opinion of this court on original appeal reported asHarrell v. State, 470 So.2d 1303 (Ala.Cr.App. 1984), and those by the Supreme Court of Alabama which affirmed this cause as ExParte Harrell, 470 So.2d 1309 (Ala. 1985). It is noted that the Supreme Court of the United States denied certiorari,474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
We have carefully considered the allegation as to the appellant's claim under Ake v. Oklahoma, 470 U.S. 68,105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and the determinations as to this issue made by the trial court below. We are of the opinion that these are correct. See also this court's opinion in Clisby v.State, 501 So.2d 480 (Ala.Cr.App. 1986), affirmed,501 So.2d 483 (Ala. 1986).
We have also carefully considered appellant's assertions with reference to his representation by counsel. We are clear to the conclusion that the appellant failed to make out a case of ineffective or inadequate representation of counsel at trial or on appeal. The appellant has wholly failed to make out a case within the meaning of Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Page 648 
We have carefully reviewed this record again with reference to the appellant's contentions concerning the ineffective assistance of counsel on his first appeal as a matter of right, in accordance with Evitts v. Lucey, 469 U.S. 387,105 S.Ct. 830, 83 L.Ed.2d 821 (1985).
Moreover, in an abundance of precaution, we have carefully reviewed each allegation and assertion made, and the work of counsel on this appeal. We find same to be in the best traditions of the Bar of Alabama and, in this case, any assertion as to inadequate or ineffective representation of counsel is utterly without merit as a matter of law and fact.
We find no error in this appeal. We have carefully reviewed each allegation and the legal arguments offered in support thereof.
For the reasons herein stated, the judgment of the Circuit Court of Jefferson County denying the petition for writ of error coram nobis, is due to be and the same is, hereby, affirmed.
AFFIRMED.
All the Judges concur.
 APPENDIX A Ed Harrell, Jr. Petitioner vs. State of Alabama, Respondent
IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA — BESSEMER DIVISION CASE NO. CC 82-1147.60
 Jan. 23, 1987. ORDER
The defendant filed a Petition for Writ of Error Coram Nobis alleging that he is entitled to relief based upon 16 claims made in numbered Paragraphs 8-34.
 I
The first claim to be considered by the Court is petitioner's attack on the constitutionality of § 13A-5-40(a)(5), Code of Alabama, 1975. This claim, enumerated In Paragraphs 8, 9, 14(b), 14(c), and 19 of the petition is barred from review by a Writ of Error Coram Nobis because it was raised on direct appeal and rejected. Harrell v. State, 470 So.2d 1303
(Ala.Cr.App. 1984), aff'd, 470 So.2d 1309 (Ala. 1985). As petitioner's claim was decided against him by the Alabama Court of Criminal Appeals, petitioner is not entitled to a hearing or relief on this claim.
 II
This claim, enumerated in Paragraph 12 of the petition contends that the trial court erred in failing to instruct the jury as to petitioner's knowledge or lack of knowledge that the victim was a police officer. This claim was raised on direct appeal and rejected. As Coram Nobis does not lie to review claims raised and rejected on direct appeal, petitioner is not entitled to a hearing or relief on this claim.
 III
This claim, enumerated in Paragraph 14(a) and 19 of the petition is that under the factual circumstances presented in this case the death penalty is disproportionately severe and excessive. This claim was also considered and rejected on direct appeal. Petitioner is not entitled to a hearing or relief on this claim.
 IV
This claim enumerated in Paragraph 14(g) is that the Capital Punishment Statute is unconstitutional because it permits the trial judge to override a jury's recommendation of life. This claim was considered and rejected on direct appeal. Petitioner is therefore not entitled to a hearing or relief on this claim.
 V
In Paragraph 18 of the petition, it is claimed that the trial court gave no consideration to mitigating factors presented in petitioner's case. This claim was considered and rejected on direct appeal. Petitioner is not entitled to a hearing or relief on this claim. *Page 649 
 VI
Petitioner's contention in Paragraph 20, that the imposition of the death sentence in this case was arbitrary, capricious and therefore constituted cruel and unusual punishment is barred from review because it was raised and rejected on direct appeal. Petitioner is not entitled to either a hearing or relief on this claim.
 VII
Petitioner claims that the Court erred in "denying petitioner's request for funds and access to a private psychiatrist (Paragraph 10)"; "The trial attorney made timely request for funds for a psychiatrist" and the same was denied (Paragraph 11) and "Petitioner . . . . . subsequent to his suicidal attempt should have been afforded independent funds for psychiatrist evaluation." (Paragraph 34)
The record in this case reflects that counsel made a motion for the Court to "provide counsel with funds to have a psychiatrist or psychological expert of the defendant's own choosing to consult and counsel with him" R 18. This claim was addressed by the Alabama Court of Criminal and decided against petitioner. The issue of whether petitioner was entitled to a psychiatrist not of his own choosing could have been raised at the trial and on direct appeal but was not. This claim is procedurally barred. Coram Nobis did not lie to review claims raised and denied on direct appeal nor is it available to review new issues not raised at trial or direct appeal. Petitioner is not entitled to a hearing or relief on the claims raised in Paragraphs 10, 11 and 34.
 VIII
In Paragraph 14(d) petitioner claims he was not afforded adequate notice of the aggravating circumstances charged by the prosecutor and considered by the trial court. This claim is barred from review by a Writ of Error Coram Nobis because it could have been raised at trial and on direct appeal but was not. Petitioner is not entitled to a hearing or relief on this claim.
 IX
In Paragraph 14(e) petitioner claims that electrocution, the execution method provided for in Alabama is unnecessarily cruel. This claim is barred from review because it could have been raised at trial and on direct appeal but was not. Petitioner is not entitled to a hearing or relief on this claim.
 X
The claim that the death penalty is unjustified as a form of punishment, enumerated in Paragraph 14(f), is barred from review by Writ of Error Coram Nobis because it could have been raised at trial or on direct appeal but was not. For this reason petitioner is not entitled to either a hearing or relief on this claim.
 XI
Paragraphs 15, 16 and 17 present claims concerning the jury venire and selection process. Petitioner claims that the jury selection process failed to exclude prospective jurors pre-disposed to favor a death sentence, exclused jurors who considered the death penalty to be cruel and unusual punishment and that he was not afforded a jury that represented a clear cross-section of the community. All of these claims are barred from consideration on Petition for Writ of Error Coram Nobis, as they could have been raised at trial and on direct appeal and were not. Petitioner is not entitled to either a hearing or relief on these claims.
 XII
Petitioner claims in Paragraph 21 that the trial Court was biased in the imposition of the death sentence. Like many of the other claims this one is barred from Coram Nobis consideration as it was not raised at trial nor on direct appeal. For these reasons petitioner is not entitled to either hearing or relief on this claim.
 XIII
In Paragraph 22 petitioner claims that petitioner's conviction and sentence are invalid and that they were the result of trial *Page 650 
and sentencing procedure which was in violation of the State and Federal law. This broadly stated claim is not sufficiently specific as to the factual basis involved to be the basis of any Coram Nobis relief. Mere naked allegations of the violation of a constitutional or statutory right which do not make a full disclosure of the specific facts relied upon do not suffice in Coram Nobis.
This claim is also procedurally barred from consideration as it could have been raised at trial or on direct appeal but was not.
 XIV
In Paragraph 31 it is claimed that "perfunctory reports and evaluations performed at Bryce Hospital were performed by staff members that were not certified and/or qualified under Alabama law and under Federal law." In Paragraph 32 it is claimed that one or more staff members had false/fake or improper credentials. In Paragraph 33, petitioner averred that any and all reports that were the basis of staff evaluations are therefore void and any and all discussions based there on were void and incorrect. The claims presented in these paragraphs were treated by the Court as a claim of newly discovered evidence. This claim was sufficient to entitle petitioner to a hearing. An evidentiary hearing was held on this claim. At this hearing, petitioner was present, was represented by counsel and presented evidence. At the hearing both petitioner and respondent stipulated to the admission into evidence the depositions of Dr. Eugene Landers, (Exhibit 1); Dr. James Thompson (Exhibit 2), and Dr. Richard Reynolds (Exhibit 3). Also admitted were the capital murder trial transcript trial record (R) and clerk record. (C.R.). In addition, any relevant reference to any portion of the voluminous medical records from Bryce and Taylor Hardin Facilities were stipulated into admission for submission with each party proposal. The Court, considered all of the evidence presented makes the following finding of fact and conclusion of law:
(1) On October 1, 1981, petitioner shot and killed Officer Tommy Thedford. On March 23, 1982, petitioner was admitted to Bryce Hospital for a lunacy commission evaluation and report. (C.R.9) Upon petitioner's admission the following experts were appointed to constitute the lunacy commission; James C. Thompson, M.D., Staff Psychiatrist; E.F. Landers, M.D., Staff Psychiatrist; and John T. Benbow, M.D., Staff Psychiatrist. In addition, qualified medical, psychological, nursing and other evaluation and treatment staff assisted in petitioner's evaluation.
(2) On March 23, 1982, Dr. Thompson, head of the Lunacy Commission, and resident psychiatrist, conducted an initial interview with petitioner. During the course of this initial interview, Dr. Thompson made a preliminary determination of petitioner's mental condition. Dr. Thompson thought petitioner was probably psychotic and malingering. (Exhibit 2, pgs. 34-35). The next phase of petitioner's evaluation consisted of ward observation, psychological testing and examinations by the other two psychiatrists on the Lunacy Commission. (Exhibit 2, pgs. 35-36). On March 29, 1982, Edwin Seger performed an examination of petitioner. (Exhibit 2, pg. 49).
(3) Seger's evaluation report was dictated and typed. Before the typewritten copy was returned to Seger, he was transferred from the forensic unit at Bryce to another unit. (Exhibit 3, pg. 39). The typed report was signed, as per hospital policy, by the forensic unit psychologist, Dr. Richard Reynolds, for Seger. (Exhibit 3, pg. 14). Dr. Reynold's signature was a procedural matter and his signing the report did not indicate that he attested to the validity of Seger's evaluation in any way. (Exhibit 3, pgs. 15, 40 and 41).
(4) Edwin C. Seger was hired as a doctoral level psychologist in October of 1973 by Bryce Hospital. His credentials were fraudulent and his employment was subsequently terminated. (Exhibit 3, pages 10-13). During the term of his employment, Segers examined petitioner at the direction of the Lunacy Commission. Seger completed an evaluation report on petitioner. (Respondent's Exhibit 1, attached to Exhibit 3). Seger's evaluation report had a diagnosis *Page 651 
of mild mental retardation, with signs of organic impairment. Seger gave credence to petitioner's claim of both auditory and visual hallucinations. It is apparent from the evidence presented, this is the only contact that Seger had with petitioner.
(5) Dr. Richard Reynolds, staff psychologist at Bryce for the past 27 years, returned to the forensic unit on April 6, 1982 from Taylor Hardin Secure Medical Facility. At some time between April 6 and April 14, 1982, Dr. Reynolds signed Seger's report. Immediately afterward, Dr. Reynolds began to doubt the validity of Seger's evaluation based on his personal observations of petitioner. (Exhibit 3, pgs. 41-42). Dr. Reynolds requested permission from Dr. Thompson to do further psychological testing of petitioner. Dr. Reynolds performed an examination on June 22, 1981, and prepared an evaluation report on petitioner's psychological condition. (Respondent's Exhibit 2, attached to Exhibit 3).
(6) Dr. Reynolds' evaluation report concluded that petitioner was deliberately malingering and fabricating information about seizure activity and hallucinatory experiences. (Exhibit 3, pg. 51). Dr. Reynolds' report was quite different from Seger's report. In Dr. Reynolds' opinion Seger's conclusions about petitioner's psychological condition could be basedxvi on Seger's lack of proper training, experience and background. (Exhibit 3, pg. 53). Dr. Reynolds observed petitioner five days a week on the ward and had observed him more than any of the three members of the Lunacy Commission.
(7) The three members of the Lunacy Commission examined petitioner and each made independent assessments as to his mental condition. Dr. Landers stated that petitioner put on "a grand performance of psychosis". (Exhibit 1, pg. 53). Further, Dr. Landers felt that petitioner's condition was "more manufactured due to his present situation than due to a prolonged psychosis." (Exhibit 1, pgs. 56-57). Dr. Landers' diagnosis of petitioner was: (a) borderline personality. (b) malingering, and (c) mild mental retardation. (Respondent's Exhibit 3, attached to Exhibit 1). Dr. Landers based his diagnosis on his observations of petitioner. (Exhibit 1, pg. 57). Dr. Landers did not know at the time he made his diagnosis of petitioner that Seger had examined petitioner at all. (Exhibit 1, pg. 61). Seger's report had no effect on Dr. Landers' independent conclusions as to petitioner's mental condition. (Exhibit 1, pg. 62). In Dr. Landers opinion, Segers' report had no effect on any member of the Bryce staff in assessing petitioner's mental status. (Exhibit 1, pg. 62).
(8) Dr. Thompson observed petitioner on July 19, 1982 as part of a team review. His diagnosis was that testing indicated border line intellectual functions and gross malingering, both as to psychosis and mental retardation. Final diagnosis was "a typical psychosis in remission" and "malingering". (Exhibit 2, pg. 28). Dr. Thompson utilized the psychological testing information gathered by Dr. Reynolds. (Exhibit 2, pgs. 28 and 40). Dr. Thompson felt that Seger's report would not have had much affect on his independent opinion of petitioner's mental assessment, while Dr. Reynolds' report confirmed his own opinion as to petitioner's malingering. (Exhibit 2, pg. 49).
(9) Both Drs. Thompson and Landers agree with the report of the Lunacy Commission. This Court finds as a fact that the Lunacy Commission report dated July 19, 1982, was not influenced by any evaluation or report prepared by or at the direction of Edwin Seger. In fact, the Lunacy Commission report was prepared by and based upon examinations and evaluations performed by qualified psychological and psychiatric personnel employed by Bryce Hospital who were properly certified and qualified under Alabama law. This Court finds as a fact that even if Seger's opinion had been valid, it would have been to petitioner's benefit and therefore petitioner could have in no way been prejudiced by Seger's actions. This Court further finds as fact that any reports or evaluations that were actually relied upon by the Lunacy Commission in making their report, were valid and therefore properly utilized. *Page 652 
(10) Petitioner was discharged from Bryce Hospital on July 27, 1982 and returned to Jefferson County. Following a purported suicide attempt, petitioner was returned to Bryce hospital on July 29, 1982. Dr. Reynolds observed petitioner upon his return to Bryce hospital and was of the opinion that there was no change in his psychological condition as previously assessed. (Exhibit 3, pg. 57). Dr. Thompson was a member of the Forensic Evaluation and Treatment Board that reviewed petitioner's condition upon his return to Bryce and certified on August 16, 1982 that petitioner was competent to stand trial. The Board found that petitioner was malingering, as had been previously diagnosed, and that his suicidal gestures were a conscious attempt to avoid prosecution on the pending capital charge. (C.R. 11-12).
(11) Petitioner was subsequently transferred to the Taylor Hardin Secure Medical Facility on September 1, 1982. The Taylor Hardin staff members concurred with the opinions of the Forensic Evaluation and Treatment Board that petitioner was competent to stand trial and was malingering. (R. 13-14). That petitioner was malingering is illustrated clearly throughout Dr. Reynolds' testimony. (Exhibit 3). Additionally, the Taylor Hardin staff made reference to petitioner's malingering and manipulative actions. Dr. Norman Poythress on October 5, 1982 classified petitioner's statements as "ridiculous sounding hallucinations and elusions — highly suspect; and having no apparent impact on his behavior." Petitioner's statements were an attempt to force a move to another area where he would "have more privileges". On September 16, 1982, petitioner asked Neal Evans, a mental health worker: "Do you think that being in here will help me in court? I mean me being in this place, will it help me in court?" These and other instances of petitioner's conduct serve to confirm the previous diagnosis of malingering.
(12) This Court finds as a fact that there was no basis for any further psychiatric evaluation, independent or otherwise, subsequent to petitioner's alleged suicide attempt. This Court finds as a fact that the original diagnosis of the Lunacy Commission was confirmed by the Forensic Evaluation and Treatment Board at Bryce and the staff at Taylor Hardin.
(13) Petitioner has failed to present any evidence that he was prejudiced in any way by Seger performing an evaluation of his psychological condition. Rather than show that an unqualified staff member's actions harmed his case by influencing the Lunacy Commission report, the evidence presented to this Court illustrates that Seger's report did not influence any member of the Lunacy Commission or the final report on July 19, 1982. The evidence shows Seger was the only unqualified staff person that had any contact with petitioner and that contact was limited. In short, it is apparent that the only staff member that was fooled by petitioner's actions was the unqualified Seger. Seger's evaluation would have served to benefit petitioner had it influenced the Lunacy Commission in the least.
(14) Additionally, there is no evidence whatsoever that Seger directed any other staff member at Bryce. The evidence also indicates that Seger was not assigned to the forensic unit after April of 1982, and therefore would not have had any effect upon testing or evaluation of petitioner subsequent to his return to Bryce or Taylor Hardin after July 29, 1982. Petitioner is not entitled to relief on this claim.
 XV
Petitioner claims that he was denied effective assistance of counsel. In Paragraph 13 he contends that counsel was ineffective because counsel did not request a jury charge as to knowledge or lack thereof that the victim was a police officer. It is also inferred that counsel was ineffective with regard to petitioner's claim of newly discovered evidence. An evidentiary hearing was held on this claim with petitioner and counsel present. The Court having considered the evidence presented and having presided over the trial in this case makes the following finding of fact:
(1) Petitioner Harrell was represented at trial by Ralph Armstrong and Arthur *Page 653 
Green, two experienced and capable criminal defense attorneys. Armstrong was appointed to represent Harrell on December 18, 1981 and Green was later appointed as co-counsel with Armstrong as lead counsel. At the time of petitioner's trial, some 75 percent of Armstrong's practice was criminal defense work. His practice is now about 90 percent criminal defense. Armstrong had handled between three hundred to five hundred felony cases and at least fifty felony trials prior to representing petitioner. Armstrong had previously represented four or five capital defendants and had never before had a client receive the death sentence. Both attorneys are, and were at the time of petitioner's trial, experienced and competent defense attorneys.
(2) In preparation for petitioner's trial, Armstrong met with petitioner eight to ten times. During the course of these conferences, Armstrong developed a defense strategy that best suited the facts presented by the evidence, and petitioner's version of the shooting. Counsel used the accidental shooting theory at trial as petitioner's defense. The evidence to support this theory included testimony that the trigger of the gun could be pulled accidentally (R. 404, 408), that the gun discharged accidentally as petitioner was removing it from his pants (R. 417, 441, 549), as it had fallen down to his knees and then his ankle (R. 417), and that petitioner did not intend to fire the gun (R. 421, 441). Counsel considered using not guilty by reason of insanity as a defense, but felt that such a defense would not be consistent with the evidence that tended to show the gun discharged accidently.
(3) As to petitioner's claim of ineffective assistance because counsel did not request a jury charge as to knowledge or lack thereof that the victim was a police officer, Armstrong testified that there was not such a statutory requirement at the time of trial. Armstrong researched the statutory and case law before trial and there was at that time no knowledge requirement. This issue was raised before the Alabama Supreme Court on direct appeal and decided adversely to petitioner's claim. Ex parte Harrell, 470 So.2d 1309, 1317 (Ala. 1985). If the Supreme Court did not believe that this Court erred in not giving such an instruction, 470 So.2d, at 1317, it would not be plausible to assume that trial counsel would be held ineffective not to request such a charge. Furthermore, the Alabama Supreme Court held that the facts of this case at bar were distinguishable from those of Ex parte Murry, 455 So.2d 72
(Ala. 1984).
(4) In addition, petitioner told counsel that he knew the victim, Tommy Thedford was a police officer. Thedford had seen petitioner a week to ten days prior to the murder and had offered to help petitioner by giving him money for food. Petitioner's own testimony at trial was: "I knew who he was. I knew who he was." (R. 416). The Court of Criminal Appeals found there was "an abundance of evidence that Thedford identified himself as a police officer." Harrell v. State, 470 So.2d 1303,1308 (Ala.Cr.App. 1984).
(5) This Court further finds that petitioner's trial counsel were not ineffective in any way with regard to petitioner's claim of newly discovered evidence. Petitioner was certified competent to stand trial and assist his attorneys in preparation of his own defense. Armstrong testified at the Coram Nobis hearing that the decision not to utilize the not guilty by reason of insanity defense was based on at least five different factors. First, his conversations with petitioner and the realization that petitioner could effectively communicate when he wanted to do so. Second, petitioner's past record being brought out at trial, including a prior murder to which petitioner pled guilty, two prior grand larceny convictions and an assault with intent to rob conviction. Third, the lack of expert witness support for the insanity defense to contradict the lunacy commission report with three psychiatrists. Fourth, the plain and simple fact that the two defense theories are incompatible. It would be unlikely that a jury could be convinced that petitioner was insane, but at the same time he was supposedly sane enough to know that the shooting was an accident. Fifth, the planning of the shake down-type crime attempted *Page 654 
against Mrs. Parsley and Mrs. Dykes, luring the would be victims to the scene of a ambush/robbery shows a step-by-step manipulation of other people by petitioner. Evidence of such a scheme would directly contradict any evidence to support an insanity defense. The facts and circumstances surrounding the crime simply would not support a claim of insanity. This Court finds as a fact that petitioner's trial counsel made a reasonable strategic decision not to utilize an insanity defense in light of what was a more plausible defense theory and the prosecution's evidence against petitioner.
(6) Petitioner has failed to meet his burden of establishing that trial counsel were constitutionally deficient for failing to request a jury charge or anything else. Petitioner has merely alleged that trial counsel did not do something his current counsel would have done. Petitioner has failed to overcome the strong presumption that trial counsel rendered effective assistance and used reasonable professional judgment.
(7) Additionally, petitioner has failed to meet his burden of proving that, but for trial counsel's failure to request a jury instruction as to knowledge that the victim was a police officer, the outcome of petitioner's trial would have been different. Petitioner presented no evidence at trial or at the Coram Nobis hearing to show that he did not know Officer Thedford was a police officer. In fact, the evidence at trial that he knew Officer Thedford was undisputed. Thus, even if the charge had been given, there is no reasonable probability that the outcome would have been different. The jury would not have been faced with an unproven element to the charged offense but rather would only have been faced with an additional element which had been proven beyond all doubt and was undisputed. Additionally, even if trial counsel had requested such an instruction and been rejected, the outcome of petitioner's case would not have been different since the Supreme Court held it was not error to fail to so charge petitioner's jury. Petitioner, thus, has failed to show prejudice and is not entitled to relief on the claim of ineffective assistance of counsel.
(8) In this case the adversarial process worked and the trial produced a just result. Petitioner falls far short of showing that counsel's performance was deficient in this case. His conviction was a result of the strength of the state's case not as a result of actions or lack of actions by counsel. The trial transcript and the evidence at the Coram Nobis hearing established that petitioner was represented by dedicated and able trial counsel who acted at all times in his behalf. Petitioner received the effective representation he was guaranteed by the Constitution. Petitioner's conviction and death sentence were not imposed because of any action or failure on the part of his trial counsel. Petitioner was convicted and sentenced to death because of the great weight of the state's evidence.
 XVI
The Court has examined all the grounds asserted by the petitioner and finds that none of them entitle petitioner to the relief sought. It is Adjudged and Decreed that the Petition for Writ of Error Coram Nobis is denied.
 DONE this the 22d day of January, 1987. /s/ Dan Reynolds CIRCUIT JUDGE