*701 OPINION OF THE COURT
Budd G. Goodman, J.
QUESTIONS PRESENTED
When a psychiatrist appointed pursuant to County Law § 722-c realizes that a case involves a defendant who has a history of brain dysfunction resulting from a prior gunshot wound to the head and knows, as he later acknowledges, that he lacks a detailed understanding of the relationship of various brain structures to emotions and behavior, what is the psychiatrist’s professional obligation to defendant and to the court? What is the appropriate judicial response to a breach of such professional obligations?
After a psychiatrist appointed pursuant to County Law § 722-c who admits his lack of knowledge about the relationship of various brain structures to emotions and behavior opines that a defendant is not responsible by reason of a combination of psychiatric disorders some of which are the result of brain dysfunction resulting from a gunshot wound to the head defendant suffered many years ago, and after defendant is examined, at this psychiatrist’s request, by an independent neurologist appointed by the court who arrives at a contrary opinion, is defendant entitled to the appointment of a second neurologist to assist the psychiatrist and defense counsel in the preparation and presentation of the defense?
STATEMENT OF THE CASE
Defendant is charged by indictment with one count of murder in the second degree (Penal Law § 125.25 [1]).[1] On October *702 21, 1994, defense counsel moved successfully pursuant to County Law § 722-c for the appointment of a board-certified psychiatrist, Stephen S. Teich, M.D., to conduct a psychiatric evaluation of defendant to aid in the defense. On January 9, 1995, Dr. Teich submitted an "initial report” in which he offered a "provisional opinion” that defendant "probably lacked substantial capacity to appreciate the nature and the consequences of his acts, and lacked substantial capacity to appreciate that they were wrong.” He indicated that he needed to review various materials and to conduct additional interviews before he could render a final opinion. Those materials were provided to him on January 13, 1995, and the case was adjourned to the date he selected, February 22, 1995, for submission of his final report.
On February 15, 1995, Dr. Teich wrote to defense counsel indicating that after reviewing defendant’s medical records, "[a]s some of the behaviors in this case are coordinate with damage to certain areas of the brain and since there are past episodes of grand mal epilepsy which likely reflect some physical damage to the brain, it is, at this time, clearly necessary to obtain a complete neurological evaluation.” On February 22, 1995, this court directed that defendant be examined neurologically at Bellevue Hospital Center and that he undergo a CT scan of the brain to localize any areas of brain damage resulting from the 1970 gunshot wound to his head, an EEG and cognitive testing, as requested by defense counsel and Dr. Teich.
The Bellevue Hospital neurologists requested that this court obtain clarification from Dr. Teich about his request for examination. By letter dated February 24, 1995, Dr. Teich summarized his review of defendant’s medical records and history and indicated, "[m]y concerns pertain to whether any of the areas of the brain involved in the primary control of and/or modulation of emotions are physically damaged, either by Mr. McLane’s childhood bullet wound, or by any means e.g., traumatic, chemical, vascular, etc. such that he 1) might have 'loss of control’ of his emotions, with 2) resultant violent physical behavior and/or 3) somewhat clouded, even partially absent memory of these outbursts, based either on a seizure disorder in these areas or, simply, on an ongoing disturbance of another sort (e.g. disinhibition) resulting from the physical damage. I am also interested in knowing whether any of Mr. McLane’s *703 brain damage could be causing cognitive deficits as well.”[2] Commenting on the lack of specificity in his request, Dr. Teich wrote, "I am sorry that I cannot be more specific, but my lack of present detailed knowledge concerning specific brain structures and the specific relationship to both emotions and behavior limits my ability to further specify.”
Bellevue Hospital’s evaluation of defendant, conducted personally by and under the supervision of Saran Jonas, M.D., Professor of Neurology and former Acting Chairperson of the Department of Neurology at New York University School of Medicine and Director of Neurology at Bellevue Hospital Center, was completed on March 3, 1995. That evaluation documented the structures of defendant’s brain that were damaged by the bullet wound and indicated that defendant suffered from posttraumatic seizures that were exacerbated by poor medication compliance, that he had suffered from a mild left lower extremity paresis as a result of the gunshot wound and that his cognitive functioning was intact. The results of this evaluation were forwarded to Dr. Teich and to defense counsel, who were informed that they could consult with Dr. Jonas and with the Bellevue neuroradiologists who interpreted the CT scan of defendant’s brain which demonstrated the areas of his brain that were damaged by the bullet wound. The case was adjourned until March 17, 1995 for Dr. Teich to submit a final report.
On March 16, 1995, Dr. Teich submitted a report opining that defendant was not criminally responsible by reason of mental disease or defect. However, he indicated that he wished to re-interview defendant and noted, "there is also additional information from records, further interviews and consultations that are important if this case is to proceed to trial in order to clearly establish the burden of proof legally required.” On March 27, 1995 defense counsel filed the instant application for appointment of a second neurologist pursuant to County Law § 722-c.
*704 defendants’ right to assistance of experts
Inherent in a criminal defendant’s Sixth Amendment right to counsel is his or her right to obtain, on a proper showing of relevance and necessity, competent expert assistance to prepare and present an adequate defense. The guarantee of fundamental fairness set forth in the Due Process Clause of the Fourteenth Amendment requires that once the State commences criminal proceedings against someone, that person must be assured of a fair opportunity to present a meaningful defense. In the case of an indigent defendant this requires that defendants have access, at State expense, to the basic tools that are necessary to preparing and presenting an adequate, meaningful defense.
When a genuine issue is raised by defense counsel concerning a defendant’s mental state in relation to a criminal proceedine it with regard to defendant’s competence to proceed, defendant’s criminal responsibility, mitigation of criminal liability based on defendant’s mental status such as in relation to the affirmative defense of extreme emotional disturbance, mental capacity to intelligently, knowingly and voluntarily waive Miranda rights, mental status in aid of plea negotiations and/or sentencing, etc. — defendant is entitled to the appointment of a competent and qualified mental health professional who can evaluate the defendant’s mental state, provide a forensic mental health opinion to defense counsel regarding the clinical-legal issues in the case, to present expert testimony, and to assist in the preparation and presentation of the defense case and in the cross-examination of any prosecution mental health experts and other witnesses. (See, Ake v Oklahoma, 470 US 68 [1985].)
New York provides that an indigent defendant who raises a genuine issue regarding his or her mental state is entitled to the appointment of a competent mental health expert at county expense.[3] A defendant is not necessarily entitled to an *705 expert of his or her choosing. Similarly, a defendant is not entitled to an expert who, after conducting a competent thorough evaluation of the defendant, provides an opinion that is favorable to the defense. Nor is a defendant entitled to obtain the services of a series of experts until he or she obtains expert support for a particular defense theory or position. Rather, defendant is only entitled to a mental health expert who is independent of the prosecution and is not biased against the defendant, who conducts a competent and appropriately thorough evaluation, who can provide information and guidance to help defense counsel understand defendant’s mental state and critically analyze other opinions and information bearing on defendant’s mental state, and who can provide assistance to defense counsel in evaluating various strategies to utilize and present information about defendant’s mental state as part of the defense.
Because expert services provided pursuant to County Law § 722-c are a charge against the county and constitute a use of precious public funds, the trial court must carefully evaluate the need for particular expert services, both as to the nature and extent of services required. Having determined that expert services are needed, the court must then approve the appointment of a particular expert or experts. The court may suggest experts or may approve experts recommended by defense counsel. Prior to approving an expert the court must preliminarily find that the expert possesses the appropriate qualifications to perform the expert services required. Usually, this can be accomplished by taking note of the profession, license and certifications of the expert. If the expert is one with whom the court is not familiar but is recommended by defense counsel, it is expected that defense counsel will have previously assured himself or herself that the expert he or she proposes is qualified to provide the expert services required. Courts may generally rely on defense counsel’s statements to that effect.
Once a court authorizes expert services, it must then determine the reasonable value of the expert services provided and award "reasonable compensation” for those services. While financial considerations must play a part in the court’s determination of "reasonable compensation”, this cannot be the overriding concern when the ability of the court to carry out its essential function of assuring justice and due process is implicated. For, other than an economic interest, there are no State interests that weigh against recognition of the right to *706 assistance of experts at State expense given the compelling interest of the State and of the defendant in a just disposition of a criminal case where a defendant’s liberty is at stake. (See, Matter of Director of Assigned Counsel Plan of City of N. Y. [Bodek], 159 Misc 2d 109, 123-124 [1993], affd 207 AD2d 307 [1st Dept 1941.) This is an exceedingly important judicial obligation, because trial courts’ orders directing compensation pursuant to County Law § 722-c are not reviewable. (See, 159 Misc 2d, at 112-113, affd 207 AD2d, at 308, supra.)
RESPONSIBILITIES OF A MENTAL HEALTH EXPERT
Prior to accepting an appointment pursuant to County Law § 722-c, a mental health expert should review the case and the request for expert services with defense counsel and/or the court. The expert should determine whether he or she possess the expertise, knowledge and skills needed to provide adequately and appropriately the requested expert services given the nature of the clinical and legal issues presented by the case. The expert should also determine that he or she has no conflict of interest, that there are no factors that would prevent him or her from rendering an objective opinion, that he or she has no biases which would interfere with him or her providing expert advice and assistance to the defense, and that he or she is able to devote the time needed to provide the required services in a timely manner. If an expert determines that they have a potential problem related to any of these areas, the expert should bring this to the attention of defense counsel and the court so that a judicial determination can be made regarding the propriety and advisability of his or her appointment (or, if the expert becomes aware of such a problem after they have been appointed, regarding the propriety and advisability of he or she continuing to provide expert services in the case).
Having been appointed, the mental health expert who is requested to evaluate a defendant has the responsibility to conduct an appropriately thorough evaluation of the defendant. This evaluation should include an examination of the defendant, a review of relevant materials relating to the case, conducting interviews of other persons who may be able to impart relevant information, obtaining and reviewing relevant educational, occupational, health, mental health and other records, arranging for appropriate tests which the expert does not personally perform (i.e., laboratory tests, EEG’s, X-rays, CT scans, psychodiagnostic tests, physical examination) to be *707 conducted, and obtaining relevant information from defense counsel and the prosecutor. The expert should maintain contemporaneous notes of his or her examination in sufficient detail to document the data obtained in the course of their examination. (See, 8 NYCRR 29.2 [3]; People v Davis, 136 Misc 2d 1076, 1080 [Sup Ct, NY County 1987]; cf., Matter of Suslovich, 174 AD2d 802, 803-804 [3d Dept 1991].)
Having conducted an appropriately thorough evaluation, the expert is then responsible to analyze critically the data obtained through his or her evaluation and to formulate an objective opinion by applying the relevant clinical data to the appropriate legal standard relating to each clinical-legal issue presented for his or her consideration.
If requested by defense counsel, the expert should explain the basis of his or her assessment to defense counsel and assist defense counsel in understanding any technical clinical information relating to defendant’s mental state. The expert should be available to assist defense counsel to analyze critically data related to defendant’s mental state that is obtained from other sources and the evaluations of defendant’s mental state performed by other experts. The expert should be available to help defense counsel prepare the presentation of information regarding defendant’s mental state. The expert should also be available to help defense counsel to prepare his or her cross-examination of prosecution mental health experts if the case eventually involves such testimony at hearings or trial.[4]
DECISION

Dr. Teich’s Breach of His Professional Obligations

When Dr. Teich realized shortly after being appointed that issues relating to brain damage were likely to be relevant in this case, given his admitted lack of specific knowledge about the relationship of various brain structures to emotions and behavior he had an affirmative obligation to inform this court and defense counsel of these limitations in his ability to provide *708 the expert services needed in this case. By continuing to proceed in this case, Dr. Teich accepted the responsibility to provide professional services that he knew or should have known he was not competent to perform, in violation of 8 NYCRR 29.1 (b) (9).[5] In doing so he seriously breached his obligations to defendant, to the court and to the medical and psychiatric professions.
At the time of his appointment, this court and defense counsel had no reason to question Dr. Teich’s competence to provide expert services in this case. As a board-certified psychiatrist, Dr. Teich is expected to have the requisite knowledge: (1) of the relationship of brain structures to behavior and emotions, (2) to be able to review and understand defendant’s medical records, the report of the defendant’s recent neurological examination at Bellevue, the results of the CT scan which show which areas of defendant’s brain were damaged by his 1970 bullet wound and the results of the various laboratory tests and EEG that were performed on defendant, and (3) to integrate that information into an over-all assessment of defendant’s mental state. Although a psychiatrist is not expected to be able to interpret the CT scan of a brain to determine which areas of the brain are damaged, once provided with a neuroradiologist’s report of the results of the CT scan of a person’s brain, a psychiatrist is expected to have the expertise to know the effects of damage to those areas of the brain. Similarly, although a psychiatrist is not expected to be able to interpret an EEG, once provided with the neurologist’s report interpreting an EEG, a psychiatrist is expected to understand the diagnostic and treatment implications of that information.
In this regard, it is noted that the examination for board certification in psychiatry by the American Board of Psychiatry and Neurology consists of written examinations in both psychiatry and neurology. The content of the written examination in neurology for candidates for board certification in psychiatry, referred to as the "psychiatry minor” examination, covers the following topics: "neuroanatomy — 13%; neuropathology — 13%; *709 neuropharmacology (neurotransmitters, anticonvulsants, interaction of commonly used psychiatry drugs, neurological drugs) — 19%; diagnostic procedures (electroencephalogram, evoked potentials, imagin-rays, computed tomography, magnetic resonance imagin spinal fluid examinations, clinical neurologic physical examination) — 16%; clinical (organic mental syndromes, neurological disordereizure disorders, head injuries, brain tumors, sleep disorders, headache, multiple sclerosis, etc. — , perceptual disorders, motor and verbal disorders, mental retardation) — 34%; and therapy and management of patients with neurological disorders — 5%.” (See, Juul and Tucker, The Part I Psychiatry Examinations: Facts About the Written Examination, in Shore and Scheiber, Certification, Recertification, and Lifetime Learning in Psychiatry, ch 4 [1994].)[6]

Dr. Teich’s Limitations as an Expert

Having admitted his "lack of present detailed knowledge concerning specific brain structures and the specific relationship to both emotions and behavior”, Dr. Teich proceeded to opine that defendant suffers from certain organic mental disorders resulting from the 1970 gunshot wound to his brain which bear on his criminal responsibility. Compounding the serious problem with Dr. Teich as a psychiatric expert is that in his instant application defense counsel indicates that "the precise parameters of those [defendant’s neurological] abnormalities are unclear to me and are also unclear to Dr. Teich.” If they are unclear to Dr. Teich, how could he opine, with a reasonable degree of medical certainty, that these abnormalities existed and how they affected this defendant at the time of the crime?
Further magnifying Dr. Teich’s serious limitations as an expert, defense counsel justifies his instant application for appointment of a second neurologist, not only to assist Dr. Teich, who has already rendered his opinion, but also, "to assist me in understanding certain references [regarding brain function *710 ing and abnormalities] in Mr. McLane’s medical records.” Those records, most of which reflect defendant’s treatment for seizure disorder and alcohol abuse, are material which Dr. Teich indicates he reviewed and relied upon in formulating his opinion. This leads to the natural conclusion that Dr. Teich does not fully understand the material contained in the medical records, including the records of the recent neurology examination at Bellevue, which material he states he relied upon in rendering his opinion. For, if Dr. Teich understood this material, there is no reason that defense counsel now needs another expert to assist him in understanding it.
Finally, conceding his lack of the requisite expertise to provide expert psychiatric services in this case, Dr. Teich indicates that he has consulted with "brain experts” and that he now needs a neurologist to consult with him regarding this case.
Accordingly, this court holds that having conceded his lack of knowledge about the relationship of brain structures to emotions and behavior, Dr. Teich will not be permitted to offer expert testimony in that regard based on what other experts have told him unless those experts have first testified. Unless such qualified experts in this area have provided expert testimony about defendant’s brain injury and/or seizures, Dr. Teich, who lacks expertise in these areas, may not rely on the opinion of such other experts in presenting his own opinion.

Dr. Teich’s Failure to Complete His Evaluation of Defendant and to File a Timely Final Report

Dr. Teich was to have submitted the final report of his evaluation and findings on February 22, 1995. Because he indicated a need for a neurological evaluation to determine what areas of defendant’s brain were damaged by the 1970 gunshot wound to his head, the date for him to submit a final report was extended to the date he agreed upon, March 17, 1995, by which time he would receive the results of the independent neurological examination of defendant conducted at Bellevue Hospital Center pursuant to an order of this court issued at his request and that of defense counsel. Having received the Bellevue material, Dr. Teich submitted a report dated March 16, 1995. However, in that report he indicates that he will need to have an additional interview with defendant and that, "[t]here is also additional information, from records, further interviews, and consultations that are important *711 if this case is to proceed to trial in order to clearly establish the burden of proof legally required.”
This court finds that the March 16, 1995 report Dr. Teich has submitted does not reflect all of the information upon which he intends to rely in rendering his opinion and cannot be considered the "final” report which he was directed to supply no later than March 17, 1995. Accordingly, Dr. Teich is directed to make contemporaneous detailed clearly written notes of any examinations, interviews or consultations subsequent to his March 16, 1995 report which reflect information he considers in this case. Those notes are to be turned over to defense counsel within three days of their creation. Defense counsel shall réview that material within four days and either provide a copy of such material to the prosecutor or submit the material in question to this court, together with an application for a protective order, so that this court may review the material in camera and determine whether or not it should be disclosed to the prosecutor. Further, within three days of his receipt of this decision and order, Dr. Teich shall provide to this court, defense counsel and the prosecutor the name, address and telephone number of each "brain expert” he has consulted with regard to this case and shall update this list within three days of his contact with any other "brain experts” he subsequently consults regarding this case.
Although Dr. Teich has failed to complete his evaluation by the March 17, 1995 date that was set by this court based on his representation that he would do so by that time, he has rendered an opinion that defendant is not criminally responsible by reason of mental disease or defect. Dr. Teich is, henceforth, only authorized to provide the following services in this case to be reimbursed pursuant to County Law § 722-c: to consult with defense counsel and other experts in order to assist defense counsel and to provide expert testimony. If Dr. Teich needs to conduct additional examinations of defendant or interviews of others and wishes authorization pursuant to County Law § 722-c to provide these services at municipal expense, defense counsel shall, within five days of his receipt of this decision and order, submit an application for such authorization, appended to which shall be an affidavit from Dr. Teich setting forth in detail the need for these services and the reason why those services could not have been and were not performed between the October 21, 1994 date of his appointment in this case and the time he provided his March 16, 1995 "final” report to this court.

*712
The Need for a Frye Hearing

In this instant application, defense counsel asserts that, "it is Dr. Teich’s opinion that the tract of the bullet and the lodging of fragments in the brain are consistent with the existence of 'emotional seizures’.” Defense counsel also notes that, "[according to Dr. Teich, Dr. Jonas holds views concerning the existence of the phenomenon known as 'emotional seizures’ (as opposed to 'motor seizures’) which would make Dr. Jonas wholly unsuited for this case. Whereas Dr. Jonas apparently believes that there is no such phenomenon known as 'emotional seizures,’ other brain experts contacted by Dr. Teich vigorously disagree.”
Clearly, by his own admission, Dr. Teich lacks the expertise to determine whether this defendant suffers from "emotional seizures” and whether the location of bullet fragments in defendant’s brain has caused such seizures. Dr. Teich notes that the independent expert, Dr. Jonas, a distinguished board-certified neurologist, reportedly does not believe that such a phenomenon exists. Therefore, it will be necessary to hold a Frye hearing (Frye v United States, 293 F 1013), prior to the trial of this case, to determine whether "emotional seizures” are a neuropsychiatric phenomenon the existence of which is generally accepted by the medical community. Accordingly, within seven days of receipt of a copy of this decision and order, Dr. Teich is directed to provide to this court, defense counsel and the prosecutor a copy of, or citations to the specific learned treatises, professional journal articles, etc., upon which he has relied or which are known to him concerning the phenomenon "emotional seizures” from which he claims defendant suffers.

The Application for Authorization Pursuant to County Law § 722-c of a Second Neurologist to Assist Dr. Teich and Defense Counsel

Defense counsel now seeks appointment of a second neurologist to clarify for him and Dr. Teich the "precise parameters of [defendant’s brain] abnormalities,” to "assist me in understanding certain references in [defendant’s] medical records,” and to allow "a full exploration of any and all organic etiologies for Mr. McLane’s violent outburst.” Defense counsel relates that, "[according to Dr. Teich, Dr. Jonas holds views concerning the [nonjexistence of 'emotional seizures’ * * * which would make *713 Dr. Jonas wholly unsuited for this case[,]” and argues that, "[t]he defense is entitled to retain experts allied with the cause of the defendant.”
Defendant has already undergone a thorough neurological evaluation at Bellevue Hospital Center pursuant to an order of this court issued at the request of defense counsel and Dr. Teich.[7] That evaluation resulted in a thorough assessment of defendant’s brain functioning including a localization of those areas of his brain that were damaged by the bullet wound to his head which he sustained in 1970. Further, Dr. Jonas has been available to aid defense counsel and Dr. Teich in understanding defendant’s medical records and in clarifying the precise parameters of defendant’s brain abnormalities. Indeed, defense counsel indicates that Dr. Teich has conferred with Dr. Jonas.
This court holds that contrary to defense counsel’s argument, the defense is not entitled to retain experts allied with the cause of the defendant. Rather, the defense is merely entitled to the assistance of competent expert(s) who are independent of the prosecution and who have no bias against the defendant. Such expertise has already been provided to the defense, at municipal expense; defense counsel does not raise any question as to the competence, expertise or independence of the neurologists at Bellevue who evaluated defendant or allege that they are biased against defendant; and simply because Dr. Jonas’s views regarding defendant’s brain abnormalities differ from those of Dr. Teich does not alter these essential facts. Defendant is not entitled to obtain the services of a series of experts until he locates one who will provide a desired opinion.
Ordinarily this court would deny defendant’s instant application. However, in this case, the court has directed that a Frye hearing be held to determine whether the existence of the phenomenon of "emotional seizures” is generally accepted by the medical community. As portrayed by defense counsel who quotes Dr. Teich, Dr. Jonas does not believe that this phenomenon exists but Dr. Teich and "other brain experts” Dr. Teich consulted "vigorously disagree.” Since Dr. Teich lacks the expertise to render such an opinion and his opinion is appar *714 ently based, at least in part, on what so-called "brain experts” have told him, it will be necessary to have one of them provide expert testimony at the Frye hearing and assist counsel in the preparation and presentation of that hearing at which Dr. Jonas may well be called as a prosecution witness.
Accordingly, given the particular circumstances of this case, due process requires that this court approve defendant’s request for appointment of a second board-certified neurologist to assist him in the preparation and presentation of a defense in this case and defense counsel’s request is, hereby, granted.[8] Because appointment of a second board-certified neurologist is being authorized to assist defense counsel with regard to the Frye hearing in this case, it makes no sense to limit the scope of that expert’s assistance to the Frye hearing and to require defense counsel to utilize otherwise the services of Dr. Jonas to explain the nature of defendant’s brain abnormalities to him, to help him understand the medical records and to aid him in the preparation and presentation of the defense. Accordingly, the second board-certified neurologist whose appointment is authorized herein shall assist defense counsel in that regard.
Defense counsel is directed to assure that the board-certified neurologist he selects is provided with all of the information and records that were made available to Dr. Teich, and confers with Dr. Jonas about his neurological evaluation and with Dr. Teich about his findings. If the neurologist believes it is necessary to examine personally the defendant, defense counsel shall notify this court promptly so that appropriate arrangements can be made. After the board-certified neurologist has conducted his evaluation and/or analysis of this case, he shall submit a report of his findings to defense counsel, who shall promptly provide copies of that report to this court and to the prosecutor.

Reasonable Compensation for Dr. Teich Pursuant to County Law § 722-c

The determination of reasonable compensation should be "based on the reasonable value of the services provided, taking *715 into account, (1) the level of skill, training, experience, talent and expertise of the expert, (2) the nature, extent and quality of the necessary services provided, and (3) the complexity of the issues involved which were the subject of the expert services.” (See, People v Louis, 161 Misc 2d 667, 673 [Sup Ct, NY County 1994], quoting Matter of Director of Assigned Counsel Plan of City of N. Y. [Bodek], supra, 159 Misc 2d, at 123-124.)
In this regard, this court notes that the psychiatric profession claims superiority over the other mental health professions — psychology, nursing, social work and counseling. Psychiatrists claim that by virtue of their training as physicians they have particular specialized knowledge, skills and expertise which allow them to integrate the biological, psychological and social factors which impact on mental functioning into their diagnoses and treatment. They claim that the ability of mental health professionals who are not physicians to integrate biological factors into their diagnoses and treatment of patients is more limited than that of psychiatrists. Without considering the merit of the psychiatric profession’s position in this regard, it represents the psychiatric profession’s standard for its members, to which standard Dr. Teich ought be held.
As noted above, Dr. Teich’s skills, talents, expertise and abilities in addressing the biological psychiatric aspects of the instant case have been far less than what is expected of a board-certified psychiatrist. The quality of the services he has provided, as well as his attention to his obligations to defendant, the court and the medical and psychiatric professions have been wanting.
Although financial considerations cannot be an overriding concern when a defendant’s right to due process is implicated, such considerations should play an important role in courts’ determinations of "reasonable compensation” under County Law § 722-c. In this regard, Dr. Teich’s serious breach of his obligations to defendant, to the court and to the medical and psychiatric professions has delayed the adjudication of the instant case. It has necessitated the appointment, at county expense, of additional experts whose services would not have been needed if Dr. Teich did not accept this case which involved issues relating to the possible effects of brain damage on emotions and behavior, an area he has now acknowledged is beyond his expertise. Thus, the appropriate judicial response to Dr. Teich’s serious breach of his responsibilities in this case is to take that into account in making the determination of "reasonable compensation” for the services he provides.
*716 Considering all of the above factors, this court finds that reasonable compensation for Dr. Teich in this case shall be at the rate of $100 per hour, one half the hourly rate he requested at the time of his appointment in this case, which rate had been provisionally approved by this court. This hourly rate reasonably compensates Dr. Teich for his services in this case, given the quality of those services and the skills, knowledge and expertise he has manifested in this case, while taking into account the added expense to the county of his breach of his obligations to defendant and to this court.
It is, therefore, ordered and directed that within seven days of receipt of this decision and order, Dr. Teich submit to this court an interim voucher for all services he has rendered in this case through March 17, 1995. Because the authorization he sought from this court included services to be provided by his assistant, Heather K. Perrin, M.A., Dr. Teich shall provide to this court a copy of her resume and a detailed statement, under oath, setting forth which services were provided by him and which services were provided, in whole or in part, by Ms. Perrin. He shall also indicate whether Ms. Perrin is his employee or works with him as an independent contractor and shall indicate the extent, if any, of compensation he has provided or has agreed to provide to her for services she renders relating to this case.

. In substance, it is alleged that defendant and Brian Curry, both homeless persons, got into an argument about their living conditions under the FDR Drive. The deceased, also a homeless person, then got into a fight with Brian Curry. Defendant and Brian Curry gained control over the deceased and Brian Curry then tied the deceased’s hands behind his back and left the scene to make a telephone call. Defendant then began accusing the deceased, who was lying on the ground, of having stolen some personal items from him earlier that day. Defendant then picked up a 3-foot, 4-by-4 piece of wood and hit the deceased in the head several times. Brian Curry then returned to the scene and stopped the defendant from further hitting the deceased. Brian Curry then kicked the murder weapon into the East River and he and the defendant then placed the deceased’s body into a mail cart and left the cart on a street construction site. After the body was discovered about two days later, a police investigation ensued. That investigation eventually led to defendant and Brian Curry, both of whom made written and videotaped statements essentially admitting these allegations about two weeks after the offense.

. This court notes that whether defendant’s conduct in the instant case was the product of a mental disease or defect or whether he was unable because of a mental disease or defect to conform his behavior to the requirements of law are not relevant to determination of his criminal responsibility. The legal criterion for the affirmative defense of lack of criminal responsibility is whether at the time of the offense, as a result of mental disease or defect, defendant lacked the substantial capacity to know or appreciate the nature and consequences of his conduct, or that such conduct was wrong. (See, Penal Law § 40.15; Interim Report of the State of New York Temporary Commission on Revision of the Penal Law and Criminal Code, 1963 NY Legis Doc No. 8, Feb. 1, 1963.)

. New York State makes expert assistance available to indigent defendants pursuant to County Law § 722-c, which provides, in pertinent part, that, "[u]pon a finding in an ex parte proceeding that investigative, expert or other services are necessary and that the defendant * * * is financially unable to obtain them, the court shall authorize counsel, whether or not assigned in accordance with a plan, to obtain the services on behalf of the defendant * * * The court upon a finding that timely procurement of necessary services could not await prior authorization may authorize the services nunc pro tunc. The court shall determine reasonable compensation for the services and direct payment to the person who rendered them or to the person entitled to reimbursement. Only in extraordinary circumstances may the court provide for compensation in excess of three hundred dollars.”

. Even if the expert’s opinion is not favorable to the defense, in most cases he or she should still be able to assist defense counsel to assess and analyze critically information about defendant’s mental state and to prepare to present information about defendant’s mental state. However, if the prosecution determines that they intend to call the expert as a witness because his or her opinion was favorable to the prosecution (see, People v Edney, 39 NY2d 620 [1976]), the defense may ask for the appointment of a second mental health expert to assist defense counsel in analyzing the mental health related data and in preparing the presentation of that data.

. 8 NYCRR 29.1 (b) (9) defines unprofessional conduct by a physician as including, "accepting and performing professional responsibilities which the licensee knows or has reason to know that he or she is not competent to perform[.]” The fact that the professional responsibilities involved in this case involve performance of a forensic psychiatric evaluation and rendering a psychiatric opinion for forensic rather than treatment purposes does not alter the applicability of this rule. (Cf., Matter of Gross v Ambach, 126 AD2d 1 [3d Dept 1987], affd 71 NY2d 859 [1988]; People v Davis, supra, 136 Misc 2d, at 1080, n 5.)

. Prior to 1977, candidates for board certification in psychiatry also had to complete oral examinations in psychiatry and neurology, which included examination of psychiatric and neurology patients. In 1977, the oral examination in neurology for candidates for board certification in psychiatry was modified to use audiovisual presentations of neurology patients rather than having the candidate examine an actual patient with a neurological disorder. In 1981, the practice of administering an oral examination in neurology for candidates for board certification in psychiatry was discontinued. (See, Hollander, The Examination in Psychiatry, in Hollander, The American Board of Psychiatry and Neurology: The First Fifty Years [1991].)

. In his February 15, 1995 letter to this court requesting a neurological evaluation of defendant, defense counsel wrote, "I shall further suggest that ADA Bibb consult with me about retaining a mutually acceptable neurologist in order to obviate the need to have Mr. McLane undergo two such examinations.”

. This court notes that defense counsel has requested the appointment of a neurologist and has requested a board-certified neurologist suggested earlier by Dr. Teich. However, had defense counsel asked instead for appointment of a second board-certified psychiatrist able to address the impact on defendant’s emotions and behavior of the 1970 gunshot wound to his head, an issue well within the realm of psychiatric expertise, the court would have granted that application instead.