700 So.2d 566 (1997)
STATE of Louisiana
v.
Mark E. MIRE.
No. 96 KA 2074.
Court of Appeal of Louisiana, First Circuit.
September 23, 1997.
*567 Doug Moreau, District Attorney, and Brenda Creswell, Assistant District Attorney, Baton Rouge, for Appellee-Plaintiff State.
Frederick Kroenke, Baton Rouge, for Appellant-Defendant Mark E. Mire.
Before FOIL, WHIPPLE and KUHN, JJ.
FOIL, Judge.
Mark E. Mire was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1. Defendant pled not guilty and not guilty by reason of insanity. After a trial by jury, he was convicted as charged. Defendant was sentenced to serve a term of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence and with credit for time served.
Defendant appealed to this court, arguing the trial court erred when it failed to grant a defense motion to perform certain neurological exams on defendant.[1] For the reasons which follow, we affirm defendant's conviction and sentence.

Facts
On July 23, 1994, Raymond Borskey, the murder victim in this case, and his girlfriend, Stacey Belleau, went to Daiquiri Magic, a small lounge near the mobile home park where the victim and defendant lived. They arrived about 12:15 to 12:30 a.m. and played pool. Ms. Belleau recalled a man with a dog coming into the lounge at some point, people laughing and someone saying the dog was ugly. The man was asked to leave the lounge. She does not recall the victim saying anything about the dog. When she and the victim returned to his mobile home, a man with a shotgun met them as they stepped out of the pickup truck. She identified defendant as the person with the gun. Mr. Borskey handed his keys to Ms. Belleau and told her to go inside and call emergency 911. Before she could open the door, she heard a gunshot. She went inside, locked the door and called emergency 911.
Rodney Cavell, a neighbor, who lived in the same mobile home park as the victim and defendant, testified that he saw defendant sitting in his van on the night in question. He stopped to borrow a cigarette and heard defendant call his dog. Mr. Cavell said defendant was sitting inside the van, drinking a beer. Defendant told Mr. Cavell that he had been to a bar, that he was waiting for Raymond Borskey to come home and that he was going to kill Raymond. Defendant said that Mr. Borskey had made a remark about "his ugly dog, his trashy dog." Defendant also was heard to say that he was "going to blow his dick off and he'd bleed to death before the cops got there." Defendant inquired how long Mr. Cavell thought it would take for the police to arrive. When Mr. Cavell stated that he believed it would be three minutes, defendant replied that it would be 30 to 45 minutes and the victim would bleed to death in that time. Defendant displayed a shotgun to Mr. Cavell, stated it was loaded with .00 buckshot and instructed Mr. Cavell to stay clear. Defendant stated that, after he shot Mr. Borskey, he was going to hide in the woods. Mr. Cavell attempted to talk defendant out of his planned attack by reminding him that he had a family; defendant stated that his family would "come visit me."
*568 Mr. Cavell thought he had time to take a shower before going to warn Mr. Borskey. However, while he was in the shower, he heard Mr. Borskey's truck. He looked out his window and saw Mr. Borskey and his date get out of the truck. Before Mr. Cavell could warn his own girlfriend to get down, he heard a gunshot. When the police arrived approximately ten minutes later, he told them that defendant stated he was going to hide in the woods.
Sergeant Robert Gonzales with the East Baton Rouge Sheriff's Department was dispatched to the scene. On the advice of a neighbor, he searched a wooded area behind the mobile home toward Plank Road. When deputies called defendant's name, he responded. The deputies continued to call and defendant continued to answer. Then, defendant began to sing "a little tune" and continued to do so until the deputies walked up to him. The deputies advised defendant of his Miranda rights and asked him where the shotgun was located. Defendant indicated that he understood his rights and directed the deputies to an area twenty yards away where the shotgun was lying on the ground. Thereafter, defendant was taken into police custody. He remarked that someone, possibly the victim, had called his dog ugly. While in custody at the Sheriff's substation, defendant commented that he "just tried to scare him, but he grabbed it [the shotgun]."
Dr. Hypolite Landry, Jr. performed the autopsy on Mr. Borskey. The victim died from a shotgun blast behind the right ear that created a large gaping wound where it exited the front part of the head.

Assignment of Error
Defendant appealed, arguing that the trial court erred when it failed to grant a defense motion to perform certain neurological and neuropsychological exams on defendant. Defendant noted in brief that two sanity hearings were conducted and that the trial court allowed defendant to retain an independent mental health expert.
After defendant's plea of not guilty and not guilty by reason of insanity, the trial court appointed a sanity commission consisting of Dr. George A. Bishop and Dr. F.A. Silva to examine defendant as to his ability to assist counsel in his defense and as to his sanity at the time of the commission of the instant offense. Dr. Bishop, a psychiatrist, filed a report which stated that defendant "knows for what he is charged, and the possible consequences of these charges. He is able to relate in considerable detail what happened on the night of the alleged event." Dr. Bishop concluded by stating, "Patient is competent to assist counsel in his defense, knows the functions of the court, and in my opinion was sane at the time of the alleged offense." Dr. Silva, also a psychiatrist, filed a report with the trial court which contained a detailed review of defendant's personal history and his version of the shooting. Dr. Silva stated that defendant understands the charges against him and the possible consequences. Further, defendant stated he planned to plead "innocent for reasons of insanity because my lawyer told me to." Dr. Silva reviewed the arrest report and a witness statement from the night of the incident. In his opinion, defendant was able to understand the charges against him, give a good account of the events and communicate with his attorney. He concluded by stating, "It also appears that Mr. Mire was sane at the time of the crime for which he is charged."
The trial court also appointed Dr. Hypolite Landry, Jr. to examine defendant as to his ability to assist counsel and as to his sanity at the time of the offense. Dr. Landry filed a report with the court which stated that defendant "understands the nature of the charges against him, he is able to assist counsel in his defense and I cannot elicit a history of a psychosis at the time of the alleged offense."
The trial court, after reviewing the reports of Drs. Bishop, Silva and Landry, ruled that defendant was able to assist counsel and to proceed to trial in this matter. The trial court further stated that the issue of sanity at the time of the offense was a jury question to be decided at trial. Thereafter, the trial court granted a defense motion to pay Dr. Thomas C. Fain up to $2,000.00 as an independent mental health expert. After consulting with Dr. Fain, defendant filed a motion *569 to transfer to the Feliciana Forensic Facility for further testing.
At the hearing on the defense motion to transfer, Dr. Fain, who was accepted by the trial court as an expert in clinical and forensic psychology, testified he met with defendant on two occasions in order to determine defendant's ability to understand his acts on the date he killed the victim. After spending approximately three hours with defendant on June 23, 1995, and two hours on July 3, 1995, Dr. Fain stated the results were "somewhat mixed." Dr. Fain said he would "have difficulty addressing for the court the issues for the McNaughton standard." Dr. Fain suggested that it would "probably [be] advisable to get a very good observation of [defendant] as well as evaluation from possibly both a neurological and neuropsychological perspective." Dr. Fain recommended that defendant be transferred in order to determine "if there is, in fact, an underlying organic disease problem." Dr. Fain further recommended to the trial court:
I think for [the] benefit of both the defendant's rights as well as the rights of society, it might be best to transfer him to Feliciana Forensic so that they could more fully evaluate him on a twenty-four hour basis, observational basis, which we can't gain in the prison as to his behavior. They have access to fully qualified neurologists as well as a qualified neuropsychologist on the staff, who I know very well. And I think they could do a very good evaluation of him and get a very good index of his circumstances.
Dr. Fain estimated that one to two weeks would be necessary to conduct the recommended evaluation. Dr. Fain could not offer "any ultimate decision as to the mental state Lof Mr. Mire at the time of the offense" without further testing. On cross-examination, Dr. Fain stated that he was not aware that three physicians had found defendant competent to proceed to trial; nor had he spoken to any of the three physicians.
During argument on the motion, defense counsel stated:
MR. KROENKE: Your Honor, I have just a short rebuttal. As I stand here, as Dr. Fain did, I'm not certain that I can cite to you a statute underwhich [sic] the Feliciana Forensic is authorized to take persons to perform the tests and evaluations we're asking to be done.
THE COURT: There isn't one.
In ruling on the defense motion, the trial court stated:
THE COURT: As I think it seems that whether we agree or not, there's no statutory authority for what you're asking, but that's not necessarily the end of it. If there were a valid need established I guess I could figure out some way to get him in [Feliciana Forensic]. The problem I have with your motion and with the grounds that you've asserted for your motion is that, at best, Dr. Fain says that there is a possibility. And that he wants to run all of these other tests to exclude that possibility. At least two other doctors have already examined Mr. Mire and found that there is no problem. If your argument is carried to its logical conclusion, if Dr. Fain is allowed to run the tests that he wants to run in this motion and he doesn't get anything, then logically he can go on and run some more tests, and if he didn't get anything, to run some more tests until he got something, if he got something. And that's just not practical nor has any need for that been demonstrated. I don't find a basis for the relief that you're requesting and for that reason your motion is going to be denied.
As noted by defense counsel, there is no codal basis for the type of examination the defense requested. Further, there is no indication in the testimony of Dr. Fain that defendant suffers from any mental condition which would render him incapable of assisting counsel at trial or that would render him incapable of distinguishing right from wrong at the time of the offense. Dr. Fain stated there was a possibility of such a disorder. His opinion was contradicted by three other experts. At best, Dr. Fain's testimony could be used by the defense at trial to establish defendant's insanity at the time of the offense.
Dr. Fain also testified at trial on behalf of defendant; he stated on cross-examination *570 that he could not "get enough data to say yea or nay" whether defendant suffered from any form of psychosis.
Although not specifically requested by the defense, the motion to transfer could be viewed as a request to have similar testing performed at a private facility. During the hearing on the motion to transfer, Dr. Fain stated that it would be possible to perform the tests he recommended at a private facility in the Baton Rouge area, but that it would require more time and funds than would be necessary at Feliciana Forensic.
In Ake v. Oklahoma, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985), the Supreme Court of the United States set forth a three-part test to decide whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the state to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense. These three factors are: 1) the private interest that will be affected by the action of the state; 2) the governmental interest that will be affected if the safeguard is to be provided; and 3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.
In the instant case, as in Ake, the private interest is the accuracy of a criminal proceeding that places an individual's life or liberty at risk. The second inquiry in Ake focused on the economic interest of the state, which was "not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions" of criminal trials. Ake, 470 U.S. at 79, 105 S.Ct. at 1094. The final inquiry concerns the probable value of the assistance sought, and the risk of error in the proceeding if such assistance is not offered. In the instant case, the value of such services and testing would be marginal at best.
The trial court and the jury had the benefit of the testimony of four separate experts on defendant's condition. Three of those experts stated that defendant was sane at the time of the offense and could assist in his defense. The fourth was very equivocal in his finding. The jury heard the testimony of Dr. Bishop wherein he stated his belief that defendant did not have any illness or disease which rendered him incapable of distinguishing right from wrong. Dr. Silva testified at trial that defendant was capable of distinguishing right from wrong, and defendant knew that killing a person was wrong.
Based on this record, we cannot say that the trial court erred when it denied defendant's request for a transfer or in the alternative for further testing at another facility. We find no reversible error. Thus, defendant's assignment of error is without merit. Accordingly, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The state argues in brief that this court should not consider defendant's argument because defendant failed to file written assignments of error in the record, citing State v. Williams, 633 So.2d 332, 334 n. 1 (La.App. 1st Cir.1993). However, in accordance with the Louisiana Supreme Court's ruling in State v. Galliano, 94-2030, 94-2280 (La. 1/6/95), 648 So.2d 911, although defendant did not properly designate any trial court ruling as a formal assignment of error as required by La.Code Crim. P. arts. 844, 916(1) and (5), and 920 in effect at the time of this appeal, this court is bound to review errors assigned and argued in brief. See State v. Galliano, 93-1101, p. 2 n. 1 (La.App. 1 Cir. 5/5/95); 655 So.2d 538, 540 n. 1. Furthermore, Articles 844(A) and 916(5) have been amended. See 1997 La. Acts No. 642, § 1.